UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-11165
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

ANTHONY W. ROBINSON,

                              Defendant-Appellant.

_____

Appeal from the United States District Court for the
              Northern District of Texas
_____
              August 8, 1997

Before WISDOM, BENAVIDES, and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

     The principal issues in this direct criminal appeal are
whether the Hobbs Act is a constitutional exercise of Congress's
power to regulate interstate commerce; and if so, whether the Act
is constitutional as applied to a defendant whose conduct, viewed
in isolation, does not substantially affect interstate commerce.

     The Hobbs Act makes it a federal offense to impede interstate
commerce through robbery or extortion.  The appellant, relying on
*United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d
626 (1995), contends that the Act is unconstitutional because it
authorizes conviction of a defendant whose conduct affects commerce
"in any way or degree."  By contrast, *Lopez* identified specific

circumstances in which federal statutes, to withstand constitutional scrutiny, must affect interstate commerce substantially.

Applying the lessons of *Lopez*, we hold that the Hobbs Act is a permissible exercise of the congressional power to regulate commerce among the states. Our holding aligns us with every other circuit that has addressed the issue.[1] We further hold that in Hobbs Act prosecutions based on local activities that affect interstate commerce, the government need not prove that the effect of an individual defendant's conduct was substantial. It suffices to show a slight effect in each case, provided that the defendant's conduct is of a general type which, viewed in the aggregate, affects interstate commerce substantially.

Although we affirm appellant's convictions, we vacate his sentence, which was erroneously enhanced on the ground that his victims, Asian-American merchants, were unusually vulnerable.

I.  FACTUAL AND PROCEDURAL BACKGROUND

In the spring and early summer of 1995, several small businesses in the Dallas area were victimized in a series of crimes that became known as the "driveway bank robberies." The victims were owners and employees of liquor stores, convenience stores, and

_____

[1]*See United States v. Harrington*, 108 F.3d 1460 (D.C. Cir. 1997); *United States v. Atcheson*, 94 F.3d 1237 (9th Cir. 1996), *cert. denied*, ---U.S.---, 117 S.Ct. 1096, 137 L.Ed.2d 229 (1997); *United States v. Farmer*, 73 F.3d 836, 843 (8th Cir.), *cert. denied*, ---U.S.---, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996); *United States v. Stillo*, 57 F.3d 553, 558 n.2 (7th Cir.), *cert. denied*, ---U.S.---, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *United States v. Bolton*, 68 F.3d 396 (10th Cir. 1995), *cert. denied*, ---U.S.---, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996).

other retail and service establishments.  The stores provided check-cashing services; the record reflects that the stores cashed out-of-state checks, payroll checks, and government benefit checks.  The record also reflects that several of the stores sold products that had been shipped to Texas from other states.  The victims testified that they suffered substantial business losses as a result of the robberies; one store was forced to close permanently for lack of capital, and the others were unable to cash checks for a finite period of time.

The robberies were carried out through a relatively sophisticated technique known as "jugging," in which the perpetrators reconnoitered the stores, learned their business routines, and struck immediately after the victims had made substantial bank withdrawals for use in cashing their customers' checks.  Typically the robberies took place in the commercial drive-up lane of the bank or in the parking lot of the store as the owner or employee returned with a cash withdrawal.

An investigation by a violent crimes task force comprising FBI agents and Dallas police officers led to the arrest of the principal suspect, Ernest Thompson, on July 1, 1995.  Arrested with Thompson was the appellant, Anthony W. Robinson, who subsequently made several self-incriminating statements to investigators. Thompson eventually pleaded guilty and testified for the prosecution at Robinson's trial. A money-laundering charge against a third defendant was dropped.

Robinson was indicted on charges of conspiring to violate the

Hobbs Act and aiding and abetting three robberies in violation of the Act.  18 U.S.C. §§ 1951(a), 2.  The victims testified at trial that these robberies caused business losses of approximately $5,000 each to Maple Convenience Store and West End Liquors, and $60,000 to S&S Foods.  Each Hobbs Act robbery count was accompanied by a count alleging that Robinson aided and abetted the possession of a firearm during a crime of violence.  18 U.S.C. §§ 924(c)(1), 2. Two of the three firearm counts were dismissed by the district court.  Before trial, the government dismissed a separate count charging Robinson as principal in a fourth Hobbs Act robbery.

After a jury trial, Robinson was convicted on the remaining counts: Hobbs Act conspiracy, aiding and abetting three Hobbs Act robberies, and aiding and abetting one firearm violation.  He was sentenced to a prison term of 210 months on the Hobbs Act counts and a consecutive 60-month term on the firearm count.  He appeals his convictions and his sentence.

II. CONSTITUTIONAL CHALLENGE TO THE HOBBS ACT CONVICTIONS

A.  *Introduction*: *First Principles*

We are mindful of the "first principles" articulated by the Supreme Court in *Lopez*: that the national government is one of enumerated powers, and that the division of authority between the national government and the states is intended to preserve the liberties of the people.  514 U.S. at ---, 115 S.Ct. at 1626. *Lopez* vividly reminds us that from time to time, the judiciary must intercede to assure that Congress does not, by enacting unconstitutional legislation under the guise of the commerce power,

4

dramatically alter the balance of federalism. We are also well aware of the arguments against shifting the primary responsibility for enacting and enforcing the criminal law from the states to the central government.

At the same time, we recognize the broad sweep of Congress's constitutional authority "[t]o regulate [c]ommerce . . . among the several [s]tates," and its concomitant power to protect the nation's commerce by enacting such laws as it deems "necessary and proper." U.S. CONST. art. I, § 8, cl. 3, 18; *see also Katzenbach v. McClung*, 379 U.S. 294, 301-02, 85 S.Ct. 377, 382, 13 L.Ed.2d 290 (1964). The Commerce Clause has long been recognized as "one of the most prolific sources of national power," *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534-35, 69 S.Ct. 657, 93 L.Ed. 865 (1949), if not the single greatest source of congressional regulatory authority. *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-4 (2d ed. 1988). Chief Justice Marshall early recognized "that the Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise." *Lopez*, 514 U.S. at ---, 115 S.Ct. at 1634 (Kennedy, J., concurring) (citing *Gibbons v. Ogden*, 9 Wheat. 1, 194, 196, 22 U.S. 1, 6 L.Ed. 23 (1824)). The exercise of this power over the past century has helped bind the disparate states of the union into a single economic whole whose productivity is unsurpassed in world history.

Against this backdrop, we do not read *Lopez* as counseling a

5

return to a "horse-and-buggy definition of interstate commerce."[2]

As Justice Kennedy, joined by Justice O'Connor, pointed out in his

*Lopez* concurrence:

> The history of the judicial struggle to interpret the
> Commerce Clause during the transition from the economic
> system the Founders knew to the single, national market
> still emergent in our era counsels great restraint before
> the Court determines that the Clause is insufficient to
> support an exercise of national power.

*Lopez*, 514 U.S. at ---, 115 S.Ct. at 1634 (Kennedy, J.,

concurring).

As Justices Kennedy and O'Connor recognized, our federal

structure exists in more than one dimension. The courts must be

vigilant to prevent Congress from asserting powers not delegated to

the national government by the Constitution, but must themselves

avoid usurping the national legislature's policy-making role in the

commercial sphere. As the next section makes clear, the

Constitution's delegation to Congress of the power to regulate the

nation's commercial life commands a significant degree of judicial

deference.

B. *Standard of Review and Level of Scrutiny*

We exercise plenary review of the district court's legal

conclusion that the Hobbs Act is constitutional, and we review the

statute itself under the deferential "rational basis" standard.

The latter point bears emphasis. In the wake of *Lopez*, courts are

---

[2]Kathleen F. Brickey, *Crime Control and the Commerce Clause: Life after Lopez*, 46 CASE W. L. REV. 801, 803 (1996) (quoting Franklin D. Roosevelt, press conference (May 31, 1935), in 4 The Public Papers and Addresses of Franklin D. Roosevelt, 200, 221 (Samuel I. Rosenman ed., 1938)).

less likely to take congressional invocations of the commerce power at face value, at least when the regulated activity's relation to interstate commerce is "[in]visible to the naked eye . . . ." *Lopez*, 514 U.S. at ---, 115 S.Ct. at 1632. In that sense, we read *Lopez* as an admonition that rational basis scrutiny is not tantamount to an abdication of the judiciary's responsibility "to say what the law is." *Marbury v. Madison*, 1 Cranch. 137, 177, 5 U.S. 137, 2 L.Ed. 60 (1803), *cited in Lopez*, 514 U.S. at ---, 115 S.Ct. at 1633. "[D]eference is not acquiescence . . . ." *United States v. Knutson*, 113 F.3d 27, 29 (5th Cir. 1997) (per curiam).

However, nothing in *Lopez* suggests that the Supreme Court has replaced the rational basis test with a more exacting standard. To the contrary:

> [T]he Court made clear that federal Commerce Clause legislation continues to merit a high degree of judicial deference, and that courts considering the constitutionality of such legislation should apply only 'rational basis' review. *Accordingly, we must limit our inquiry to a determination whether Congress could have had a rational basis to conclude that its enactment of [the statute] was a valid exercise of its commerce power.*

*Id.* (footnotes and internal citations omitted; emphasis added).

We are thus bound to uphold the Hobbs Act if Congress could have had a rational basis for concluding that its enactment was valid under the Commerce Clause. The *Lopez* Court catalogued three principal ways in which Congress may validly exercise its constitutional power to regulate interstate commerce. Before considering the Hobbs Act itself, we turn to the *Lopez* decision and its taxonomy of the commerce power.

C. Lopez *and the Three Categories of Commercial Legislation*

7

The statute at issue in *Lopez* was the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime to possess a firearm in the vicinity of a school. Alfonso Lopez, Jr., a twelfth-grade student at Edison High School in San Antonio, had been arrested for carrying a handgun and five bullets to school. This court reversed his conviction for violating the Gun-Free School Zones Act, and the Supreme Court affirmed, holding that the statute was unsupported by the congressional power to regulate commerce. *United States v. Lopez*, 2 F.3d 1342 (5th Cir. 1993), *aff'd*, 514 U.S. 549, 115 S.Ct. 1624.

The *Lopez* Court described "three broad categories of activity" that Congress may regulate under the commerce power. 514 U.S. at ---, 115 S.Ct. at 1629. "First, Congress may regulate the use of the channels of interstate commerce." *Id.* This category extends beyond the regulation of highways, railroads, air routes, navigable rivers, fiber-optic cables and the like. Under pre-*Lopez* precedents, Congress may legislate "to keep the channels of interstate commerce free from immoral and injurious uses . . . ." *Id.* (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256, 85 S.Ct. 348, 357, 13 L.Ed.2d 258 (1964) (internal quotation marks and citation omitted)). This branch of the commerce power thus provided a basis for the civil rights legislation prohibiting racial discrimination in public accommodations upheld in *Heart of Atlanta Motel*. This category also is generally understood to encompass legislation aimed at preventing the misuse of the channels of commerce, such as statutes

8

prohibiting interstate traffic in kidnapped persons, stolen goods, and prostitutes. *See, e.g.,* 18 U.S.C. §§ 1201, 2314, 2421.

The second category comprises "the instrumentalities of interstate commerce, or persons or things in interstate commerce." *Lopez*, 514 U.S. at ---, 115 S.Ct. at 1629. This branch of the commerce power supports, for example, federal legislation prohibiting the destruction of aircraft and the theft of goods from interstate shipments. *Lopez*, 514 U.S. at ---, 115 S.Ct. at 1629 (citing *Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)).

Finally, the commerce power "includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *Id.* at ---, 115 S.Ct. at 1629-30 (citations omitted). *Lopez* squarely held that under this third category, federal legislation concerning an intrastate activity is permissible only when the regulated activity "substantially affects" interstate commerce. A "relatively trivial" effect on interstate commerce cannot serve as a pretext for the "broad general regulation of state or private activities." *Id.* at 1630 (internal quotation marks and citation omitted). Nonetheless, activities which at first blush appear to be local in character repeatedly have been held subject to federal regulation because, either standing alone or cumulatively, they substantially affect interstate commerce. According to the Supreme Court, examples include coal mining, loan- sharking, the operation of racially

9

segregated restaurants and hotels, and the production and consumption of homegrown wheat. *Id.* at 1630 (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), *Perez*, *McClung*, *Heart of Atlanta Motel*, and *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)).[3]

In *Lopez*, the Supreme Court quickly dismissed the possibility that the Gun-Free School Zones Act fell within either of the first two categories. *Lopez*, 514 U.S. at ---, 115 S.Ct. at 1630. The Court then analyzed the statute under the third category and found it constitutionally deficient for three reasons. First, the Gun-Free School Zones Act had "nothing to do with 'commerce' or any sort of economic activity, however broadly one might define those terms." *Id.* at 1630-31. Because the possession of a gun near a school has no demonstrable effect on commerce, Congress could not rationally have concluded that the proscribed conduct, "viewed in the aggregate," substantially affected interstate commerce. *Id.* at 1631. Second, the Gun-Free School Zones Act did not contain an express jurisdictional element which would have "ensure[d], through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at 1631. Finally, there were

---

[3]The *Lopez* opinion cited *Heart of Atlanta Motel* in its discussion of both the first and third categories. *Compare* 514 U.S. at ---, 115 S.Ct. at 1629 *with id.* at ---, 115 S.Ct. at 1630.

Recourse to the formal categories described in *Lopez* is unnecessary when an act of Congress directly regulates interstate commerce or enterprises engaged in interstate commerce. *See United States v. Robertson*, 514 U.S. 669, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (per curiam).

neither legislative findings nor a legislative history illuminating how Congress rationally could have determined that gun possession in school zones substantially affected interstate commerce. Congressional findings, though not strictly required, might have revealed a constitutional basis for the legislation "even though no . . . substantial effect [upon interstate commerce] was visible to the naked eye . . . ." *Id.* at 1631-32.

We think *Lopez* makes clear that legislation concerning an intrastate activity will be upheld if Congress could rationally have concluded that the activity, in isolation or in the aggregate, substantially affects interstate commerce. This standard will almost certainly be met if a statutory jurisdictional element ensures that an effect on interstate commerce must be proved in each case. Even in the absence of such a statutory requirement, we will uphold the challenged statute if the regulated conduct's connection to interstate commerce is manifest, *i.e.*, "visible to the naked eye." If we do not readily perceive a clear connection to interstate commerce, we may nevertheless uphold the statute if the nexus is satisfactorily explained by congressional findings or the legislative history. Conversely, if the statute, the congressional findings, and the legislative history provide no rational basis for concluding that the regulated activity has the required nexus to interstate commerce, the statute must fall.

D. *The Hobbs Act*

The Hobbs Act imposes criminal penalties on anyone who "in any way or degree obstructs, delays, or affects commerce or the

11

movement of any article or commodity in commerce, by robbery or extortion[,] or attempts or conspires so to do . . . ."  18 U.S.C. § 1951(a).  The statutory definition of "commerce" is co-extensive with constitutional limits; the Act defines "commerce" to include "all commerce between any point in a State . . . and any point outside thereof; . . . and all other commerce over which the United States has jurisdiction."  18 U.S.C. § 1951(b)(3).

There are thus two elements in a Hobbs Act prosecution: (1) a robbery, act of extortion, or an attempt or conspiracy to rob or extort; and (2) an interference with interstate commerce.  *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960).  It follows from the second element that an effect on commerce must be proven in every case.  However, the pre-*Lopez* case law firmly established that this so-called jurisdictional element is satisfied by a showing of a minimal effect on interstate commerce.[4]  *United States v. Box*, 50 F.3d 345, 352 (5th Cir.) (internal citation omitted) ("slight" effect), *cert. denied*, ---U.S.---, 116 S.Ct. 309, 133 L.Ed.2d 213 (1995); *United States v. Collins*, 40 F.3d 95, 99 (5th Cir. 1994) ("*de minimis*" effect), *cert. denied*, ---U.S.---, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995).  Moreover, a robbery or extortionate act that depletes the assets of

---

[4]Courts use the phrase "jurisdictional" in this context as shorthand for the idea that absent a nexus to interstate commerce, the federal government is not empowered to regulate.  Of course, the commercial nexus element in the Hobbs Act is not "jurisdictional" in the sense that a failure of proof would divest the federal courts of adjudicatory power over the case.  The commercial nexus requirement is in fact a substantive element of the crime.  With that caveat, we will follow the general usage by referring to the Act's commercial nexus element as jurisdictional.

12

a commercial enterprise, impairing or delaying its ability to buy goods or services in interstate commerce, satisfies the jurisdictional test. *See, e.g., Collins*, 40 F.3d at 99; *United States v. Martinez*, 28 F.3d 444, 445 (5th Cir.), *cert. denied*, 513 U.S. 910, 115 S.Ct. 281, 130 L.Ed.2d 197 (1994).

The Supreme Court long ago upheld the Hobbs Act against a Commerce Clause challenge, reasoning that the statute "is directed at the protection of interstate commerce . . . ." *United States v. Green*, 350 U.S. 415, 420, 76 S.Ct. 522, 526, 100 L.Ed. 494 (1956). The question is whether the Act remains valid in light of its requirement of a *de minimis* effect on interstate commerce, or whether *Lopez* requires a substantial effect. As explained below, we conclude that even if *Lopez* imposes a new requirement of substantiality, that requirement applies to the class of cases prosecuted in the aggregate; in any particular case, proof of a slight effect on interstate commerce suffices.

E. *Constitutionality of the Hobbs Act under* Lopez

The Hobbs Act differs from the late Gun-Free School Zones Act in critical respects. The Gun-Free School Zones Act concerned an activity, gun possession in and near schools, which bore no evident relation to interstate commerce. In contrast, the nexus between robbery and commerce is obvious: a successful robbery results in the transfer of money or goods from the victim to the perpetrator. Where, as in this case, the money belongs to commercial establishments engaged in interstate commercial transactions, the connection between the crime and interstate commerce is not

13

difficult to discern.

In addition, the Hobbs Act includes an express jurisdictional element of the sort conspicuously lacking in the Gun-Free School Zones Act. This requirement explicitly limits the scope of the Hobbs Act to those robberies and extortion schemes which affect interstate commerce. *Compare Lopez*, 514 U.S. at ---, 115 S.Ct. at 1631 (faulting the Gun-Free School Zones Act for the absence of an "express jurisdictional requirement which might limit its reach to a discrete set of firearm possessions that . . . have an explicit connection with or effect on interstate commerce").[5]

Appellant nonetheless invokes *Lopez* to challenge his Hobbs Act convictions on several grounds. Appellant's terminology is none too precise, but we understand him to be making three distinct arguments. First, he claims that the Hobbs Act is unconstitutional on its face because it allows convictions on evidence of less than a substantial effect on interstate commerce. Second, he argues that the Act is unconstitutional as applied to a broad category of cases, including this one, involving local crimes whose effect on interstate commerce is less than substantial. Finally, he argues that the indictment, evidence, and jury instructions were deficient because they did not adhere to the substantial effect requirement.

---

[5]The Hobbs Act may also have a more compelling legislative history than did the Gun-Free School Zones Act. *See Bolton*, 68 F.3d at 399 (quoting H.R. Rep. No. 238, 79th Cong., 1st Sess. (1945), *reprinted* in 1946 U.S.C.C.A.N. 1360, 1370 ("[T]hose persons who have been impeding interstate commerce . . . shall not be permitted to continue such practices without a sincere attempt on the part of Congress to do its duty of protecting interstate commerce.")). However, we need not belabor the legislative record to decide this appeal.

1. *Appellant's Facial Challenge*

For appellant to prevail on his claim that the Hobbs Act is facially unconstitutional, he must establish that there is no set of circumstances in which the Act be applied constitutionally. *See Barnes v. Mississippi*, 992 F.2d 1335, 1342 (5th Cir.) (internal citations omitted), *cert. denied*, 510 U.S. 976, 114 S.Ct. 468, 126 L.Ed.2d 419 (1993). That is, he must show that Congress could not rationally have determined that any single instance of robbery or extortion proscribed by the Act falls within the reach of its regulatory authority under the Commerce Clause.

This places a heavy burden on the appellant. "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully." *Webster v. Reproductive Health Services*, 492 U.S. 490, 524, 109 S.Ct. 3040, 3060, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring) (internal quotation marks and citation omitted). The mere possibility that the Act "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid . . . ." *Id.* (internal quotation marks and citation omitted).

Appellant seeks to establish that the Hobbs Act is invariably unconstitutional in application by following the Supreme Court's reasoning in *Lopez*. He claims that the Hobbs Act, like the Gun-Free School Zones Act, neither regulates the use of the channels of commerce nor protects persons and things in, or instrumentalities of, interstate commerce. He then purports to explain why the Act cannot be applied constitutionally as a regulation of intrastate

activities which substantially affect interstate commerce.

This argument is utterly misguided. It relies on the unsupported assumption that the Hobbs Act can be applied constitutionally, if at all, solely under the third branch of the commerce power. We think it obvious that in various factual settings, the Act proscribes conduct which Congress may reach under the first two branches of the commerce power. For example, a Hobbs Act prosecution for hijacking a truck and its cargo on an interstate highway surely could be upheld under either the first or second branch of the commerce power.

On that basis alone, appellant cannot meet his burden of establishing that the Hobbs Act is invariably unconstitutional in all factual circumstances.[6] Moreover, as we explain below, the Hobbs Act can be applied constitutionally under the third branch of the commerce power, given the requisite effect on interstate commerce. Because there are circumstances in which the Hobbs Act operates constitutionally, we reject appellant's facial challenge.

2. *Appellant's As-Applied Challenge*

The main thrust of appellant's brief is that the Hobbs Act is unconstitutional as applied to intrastate activities, such as the subject robberies, which affect interstate commerce. His theory

---

[6]Appellant's facial challenge is essentially a claim that the statute sweeps too broadly; in his view, "the Hobbs Act overreaches impermissibly beyond the 'substantially affects' restraint imposed by the Supreme Court in *Lopez*." Unfortunately for appellant, the Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Webster*, 492 U.S. at 524, 109 S.Ct. at 3060 (O'Connor, J., concurring) (internal quotation marks and citation omitted).

16

with respect to this genus of Hobbs Act prosecutions is simple and rather elegant; we view it also to be wrong.

Appellant contends that because a specific Hobbs Act conviction requires only an "effect" on interstate commerce, the *Lopez* requirement of a "substantial effect" in cases involving intrastate activity is not met. The government responds that even if the substantial effect test applies, the Hobbs Act passes it.[7]

In determining whether the effect of a regulated activity on interstate commerce is substantial, courts must look to the cumulative effect of all similar instances of the regulated activity, carried on in different places by different persons. *Lopez* did not undermine this principle, which was articulated decades ago in *Wickard v. Filburn*. To the contrary, the *Lopez* court categorically stated:

> Where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.

---

[7]The government suggests in passing that the substantial effect test may not apply. Of the five circuits to have upheld the Hobbs Act against *Lopez*-based challenges, only the Tenth Circuit did so by applying the substantial effect test. *See Bolton*, 68 F.3d at 99. The Ninth Circuit and District of Columbia Circuit explicitly held the test inapplicable on the ground that the Hobbs Act regulated interstate, rather than intrastate, activities. See *Harrington*, 108 F.3d at 1470; *Atcheson*, 94 F.3d at 1242-43.

These cases relied on the Supreme Court's holding that the substantial effect test governs only "purely *intra*state commercial activities that nonetheless have substantial *inter*state effects." *United States v. Robertson*, 514 U.S. 669, ---, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995) (per curiam) (emphasis in original) (internal citation omitted).

In our view the Hobbs Act regulates both interstate commercial activities and intrastate activities that affect interstate commerce. In any event, we need not decide whether *Robertson* supplies an alternative basis for upholding the Act.

17

*Lopez*, 514 U.S. at ---, 115 S.Ct. at 1629 (internal quotation marks and citation omitted).

The third branch of the commerce power would be negligible if its exercise were limited to particular incidents, each of which individually has a substantial effect upon the nation's commerce. Under this straitened interpretation of congressional power, such clearly established uses of the commerce power as the mining legislation in *Hodel* and the civil rights legislation in *McClung* would be called into question. As our court has noted, however, *Lopez* "did not purport to eliminate or erode well-established Commerce Clause precedents." *Knutson*, 113 F.3d at 29 (citing *Lopez*, 514 U.S. at ---, 115 S.Ct. at 1634).

It is a bedrock principle of modern Commerce Clause jurisprudence that Congress may regulate a category of activity whose many instances, taken together, substantially affect interstate commerce. The Court explained this aggregation principle in *McClung*, a case involving a restaurant which bought meat from a local supplier who in turn was supplied from out of state. The Court observed:

> It goes without saying that, viewed in isolation, the volume of food purchased at Ollie's Barbecue from sources supplied from out of state was insignificant when compared with the total foodstuffs moving in commerce.

379 U.S. at 300-01, 85 S.Ct. at 382. The Court nonetheless found the requisite connection to interstate commerce, quoting the *Wickard* Court's reasoning for applying federal agricultural regulations to the production and consumption of homegrown wheat:

That appellee's own contribution to the demand for wheat

18

> may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.

*Id.* at 301, 85 S.Ct. at 382 (quoting *Wickard*, ---U.S. at 127-28, 63 S.Ct. at 90). The same note was sounded by Justice Black, concurring in both *McClung* and *Heart of Atlanta Motel*:

> [I]n deciding the constitutional power of Congress in cases like the two before us we do not consider the effect on interstate commerce of only one isolated, individual, local event, without regard to the fact that this single local event when added to many others of a similar nature may impose a burden on interstate commerce by reducing its volume or distorting its flow.

379 U.S. at 275, 85 S.Ct. at 367 (Black, J., concurring).

The Tenth Circuit relied on this aggregation principle to uphold the Hobbs Act against a *Lopez*-based challenge. *See United States v. Bolton*, 68 F.3d 396, 399 (10th Cir. 1995), *cert. denied*, ---U.S.---, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996). The court observed that "*Lopez* did not . . . require the government to show that individual instances of the regulated activity substantially affect commerce . . . ." *Id.* at 399. The Tenth Circuit instead read *Lopez* as allowing for the application of federal law based on a *de minimis* nexus to interstate commerce, provided that the "statute regulates an activity which, through repetition, in aggregate has a substantial effect on interstate commerce." *Id.* (internal citation omitted). The court found that the Hobbs Act was such a statute and upheld its constitutionality. *Id.*

We find the reasoning of *Bolton* unassailable. We agree that under the third category of the commerce power described in *Lopez*, the particular conduct at issue in any given case need not have a

19

substantial effect upon interstate commerce. Congress is free to act--and the government to apply the law--so long as the regulated activity, in the aggregate, could reasonably be thought to substantially affect interstate commerce.

Appellant's as-applied challenge to the Hobbs Act collapses in the face of the aggregation principle. Every robbery or act of extortion in violation of the Hobbs Act must have an effect on interstate commerce; the Act's express jurisdictional element ensures this. It follows with the inexorable logic of the multiplication table that the cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce. Unlike gun possession in a school zone, robberies affecting interstate commerce are precisely the sort of acts "that might, through repetition elsewhere, substantially affect . . . interstate commerce." *Cf. Lopez*, 514 U.S. at ---, 115 S.Ct. at 1634.

In this case, there was evidence that the stores targeted by Robinson's gang were robbed of thousands of dollars and, moreover, that the robberies impaired their ability to cash out-of-state checks and to restock goods shipped from other states. The jury necessarily found that this disruption amounted to an effect on interstate commerce. We have no doubt that such disruptions, if repeated at retail stores across the nation, would amount to a substantial effect upon interstate commerce. Accordingly, we reject appellant's claim that with respect to his intrastate activities, which may have affected interstate commerce less than substantially, the Act was unconstitutionally applied.

20

3. *Related Prosecutorial and Trial Errors*

Appellant presents a final cluster of arguments relating to the supposed inadequacy of the indictment, proof, and jury instructions. He contends that the indictment failed to allege that the subject robberies substantially affected interstate commerce. He further contends that the evidence at trial was insufficient to prove a substantial effect on interstate commerce. Finally, he claims that the district court erred by failing to instruct the jury that such proof was required.

Assuming these arguments have been preserved for review, they are entirely without merit. Because a Hobbs Act robbery, viewed in isolation, need not have more than a minimal effect upon interstate commerce, appellant's arguments fall of their own weight.

Appellant's challenge to his firearm conviction was entirely derivative of his Hobbs Act arguments. A conviction under 18 U.S.C. § 924(c)(1) must be premised on the use or carrying of a firearm in connection with a crime subject to federal jurisdiction. Robinson contends that because the underlying robberies were not constitutionally within the reach of federal law, his firearm conviction is invalid. Our finding that the Hobbs Act was applied constitutionally disposes of this argument. *Accord Bolton*, 68 F.3d at 399 n.2.

Appellant urges reversal of his convictions on several additional grounds. Having carefully considered the arguments in light of the record and the applicable law, we hold that no reversible error occurred. We affirm on all counts.

F.  *First Principles Revisited*

Because of the profound issues raised by the *Lopez* decision, and in light of the guerilla campaign now being waged against federal statutes in the name of *Lopez*,[8] we offer these concluding observations.

We are acutely aware that the robbery of a neighborhood store, or even several such stores in one large city, is not the prototypical Hobbs Act violation.  As other courts have noted, the principal evil which inspired the passage of the Hobbs Act was, quite literally, highway robbery, especially those robberies committed by racketeers operating through labor unions. *See, e.g., United States v. Woodruff*, 941 F.Supp. 910, 916-17 (N.D. Cal. 1996) (internal citations omitted).  As the Eighth Circuit has aptly observed, the congressional authors of the Hobbs Act "no doubt . . . had in mind primarily offenses with a broad impact on interstate commerce, as opposed to local robberies normally prosecuted under state law[.]" *Farmer*, 73 F.3d at 843.  However, the reach of a statute is not determined by its authors' thoughts but by their words, and the text of the Hobbs Act "in no way exclude[s] prosecutions for single local robberies," so long as the requirement of a nexus to interstate commerce is met. *Id.*

---

[8]By one count, by December 1995 (a mere eight months after the *Lopez* decision) more than eighty district and circuit court opinions had decided *Lopez*-based challenges to federal criminal statutes. *See* Andrew Weis, *Note, Commerce Clause in the Cross-Hairs*, 48 STAN. L. REV. 1431, 1432 (1996).  Among the most frequently challenged statutes are those prohibiting machine-gun possession, carjacking, failure to pay child support, and gun possession by felons. *Id.* at 1432-33 (internal citations omitted).

Eloquent voices have been raised against precisely this sort of federalization of the criminal law.[9]  Among the familiar complaints are that the creation of new federal crimes burdens the federal courts, delaying civil trials; that similarly situated defendants receive unequal procedural protections and sentences, depending on whether they are charged under state or federal law; and that the expansion of federal jurisdiction impedes the ability of the states to innovate in the field of criminal justice.  Andrew Weis, *Note, Commerce Clause in the Cross-Hairs*, 48 STAN. L. REV. 1431, 1439-40 (1996).

Whether the proliferation of federal crimes should be lamented or celebrated, however, is not for us to say.  The federal courts were not elected to represent the will of the people and ought not superintend congressional policy judgments.  Our opinion today does not address the wisdom of applying the Hobbs Act to local crimes that affect interstate commerce, but only the constitutionality of doing so.  In upholding the Act, we have relied on the analytical framework of *Lopez*, interpreted consistently with several decades of prior Commerce Clause decisions.

In our view, *Lopez* teaches two quite distinct lessons. First, *Lopez* stands for the principle that certain activities, but not

---

[9]As the late Judge Henry J. Friendly put it:

The Founding Fathers, I think, would have been surprised to find the federal courts trying cases of corruption in the New York City administration simply because one of the participants had rowed across the Hudson in the course of the criminal venture.

HENRY J. FRIENDLY, FEDERAL JURISDICTION: A GENERAL VIEW 61 (1973).

others, can be regulated under the Commerce Clause. *Lopez* holds that the proper objects of the interstate commerce power are interstate commerce and those local activities which, in isolation or in the aggregate, substantially affect it. The Court's elaboration of this point yielded the rules of decision which we employed, with little difficulty, in our analysis today.

The second, more subtle lesson of *Lopez* is that there are "outer limits" to the commerce power, beyond which Congress may not trespass. *See Lopez*, 514 U.S. at ---, 115 S.Ct. at 1628. These limits exist because of the importance of the states in the structure of our federal system, and because of the disastrous consequences which would follow were we to "obliterate the distinction between what is national and what is local." *Id.* at ---, 115 S.Ct. at 1629.

Precisely how the lower federal courts are to police the outer boundary of the commerce power is left unsaid.[10] In particular, we do not yet know whether a statute which passes the substantial effect test of *Lopez* may nonetheless be struck down as intruding into areas traditionally managed by the states. Previous judicial experiments in protecting the states from federal encroachment under the commerce power have a mixed record of success. *See National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49

---

[10]At one point the Court suggests that a plain statement rule may apply. *See id*. at ---, 115 S.Ct. at 1631 (quoting *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) ("[U]nless Congress states its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.")).

L.Ed.2d 245 (1976), *overruled by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). *But see New York v. United States*, 505 U.S. 144, 176, 112 S.Ct. 2408, 2428, 120 L.Ed.2d 120 (1992) (federal government cannot "commandeer[] the legislative processes of the States . . . ." (internal quotation marks and citation omitted)).

As the circuit that struck down the Gun-Free School Zones Act, we are acutely aware of the importance of protecting the integrity of the states and preventing the commerce power from becoming a national police power. In our own cases, we have taken steps toward setting an outer limit on the commerce power by circumscribing the government's ability to prosecute crimes targeting private residences and individuals in their homes. *See United States v. Collins*, 40 F.3d 95, 99 (5th Cir. 1994) (holding interstate commerce nexus "too attenuated" where employee of national computer company was robbed at home); *see also United States v. Corona*, 108 F.3d 565, 570 (5th Cir. 1997) (casting doubt on sufficiency of commercial nexus in a federal arson prosecution based on a fire at a private home) (*dicta*). Nothing in today's decision forecloses the development of this line of cases.

Despite these efforts, we recognize that there is a danger in the courts transforming a general axiom of federalism into a rule of decision to determine the outcome of particular cases. A jurisprudence of undefined "outer limits" surely would repose too much discretion in the courts. *See, e.g., Woodruff*, 941 F.Supp. at 913 (striking down Hobbs Act conviction in order "to correct an

25

imbalance in the scales of power"). Our task as judges is not to go abroad in search of dragons to slay. In this circuit, we shall apply the doctrinal rules articulated by *Lopez* and other binding precedents, albeit with a heightened sensitivity to potential federal incursions into the traditional sphere of state authority.

Fortunately, the case before us does not involve a federal law that intrudes into an area traditionally within the exclusive purview of the states. This is not a case involving public education, domestic relations or municipal zoning.[11] Although this is a criminal case, the statute at issue was enacted to protect the nation's commerce from local threats which, in the aggregate, could substantially affect that commerce. There is no usurpation here.

In sum, we uphold the Hobbs Act and its application to Robinson, confident that our decision does no violence to the principle of limited federal power articulated in *Lopez*.

III. DISCUSSION OF SENTENCING ISSUES

Appellant was sentenced on September 6, 1996, to 210 months imprisonment on the Hobbs Act counts and a consecutive term of 60 months on the firearm count. *See generally* UNITED STATES SENTENCING COMMISSION, GUIDELINES MANUAL (1995). He contends that the district court impermissibly enhanced his offense level based on the "vulnerable victim" guideline, U.S.S.G. § 3A1.1. We agree.[12]

---

[11]We use these as examples of subjects traditionally superintended by state law. We intimate no opinion as to whether federal legislation regulating any of these areas might be constitutional under the Commerce Clause.

[12]We reject appellant's contention that the district court erred by enhancing his offense level for obstruction of justice.

26

The Sentencing Guidelines provide for a 2-level enhancement of the defendant's offense level for offenses against "unusually vulnerable" victims. The applicable guideline states:

> If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by **2** levels.

U.S.S.G. § 3A1.1(b).

By its terms, this section applies only if (1) a victim was unusually vulnerable because of age, physical or mental condition, or was "otherwise particularly susceptible to the criminal conduct"; and (2) the defendant actually knew or should have known of the victim's vulnerability or susceptibility. *See United States v. Castellanos*, 81 F.3d 108, 110 (9th Cir. 1996).

Appellant received a "vulnerable victim" enhancement for each count of conviction. His enhanced offense level for each count was then incorporated into the calculation of his sentence under the guidelines' rules for grouping multiple counts. *See* U.S.S.G. Ch. 3, Pt. D. Robinson objected to each vulnerable victim enhancement in the court below and now appeals these adjustments to his offense level. We review the district court's interpretation of the guidelines *de novo*; we review a finding of unusual vulnerability for clear error and to determine whether the district court's conclusion was "plausible in light of the record as a whole."

---

U.S.S.G. § 3C1.1. We likewise reject his claim that the district court impermissibly double-counted the conduct underlying his firearm conviction as the basis for both a consecutive sentence and an offense level enhancement. *See* U.S.S.G. §§ 2B3.1(b)(2)(A),(C); *id.* § 2K2.4, comment., note 2; *id.* § 3D1.1, comment., note 1.

*United States v. Scurlock*, 52 F.3d 531, 541-42 (5th Cir. 1995); *United States v. Brown*, 7 F.3d 1155, 1160 (5th Cir. 1993).

The vulnerable victim enhancements in this case were proposed in the Presentence Investigation Report (PSR) prepared by the probation officer. Prior to sentencing, appellant objected, contending that the victims in this case were not "unusually vulnerable." He pointed out that according to the guidelines commentary, "a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank." U.S.S.G. § 3A1.1(b), comment., note 2. Robinson argued that the merchants victimized in this case were analogous to the bank teller described in the commentary, and were distinguishable from the commentary's examples of unusually vulnerable victims--defrauded cancer patients and handicapped robbery victims.

In an addendum to the PSR, the probation officer responded that the vulnerable victim enhancement was warranted. She stated:

> The victims targeted in these offenses were Asian or Korean [sic] business people who were either the owners of a convenience store or some other business establishment which kept large amounts of cash. The business establishments were in ethnic minority neighborhoods and cashed checks for people living in the neighborhood. It is the probation office[']s position that these victims were more susceptible to this type of offense and were targeted for that reason.

The district court, expressly adopting the probation officer's reasoning, held that Robinson "knew or should have known that these robberies were being committed with the intention of preying upon Asian and Korean [sic] business people and that these individuals were selected because of their vulnerability." The government

28

seeks to uphold this enhancement on the ground that the Asian-American merchants targeted "were not as 'street-savvy' or 'crime-conscious'" as other merchants. The government cites Thompson's testimony that Asian-Americans were perceived as careless in handling large sums of cash.

We hold that the district court clearly erred in finding that these victims were "unusually vulnerable." The guidelines do not support the view that members of racial minority groups, in this case Asian-Americans, are unusually susceptible to crime.[13] Nor is a vulnerable victim enhancement appropriate on the basis of the victims' employment as merchants in stores that deal in a high volume of cash. Under the guidelines, a vulnerable victim enhancement must stem from a personal trait or condition of the victim, rather than the position he occupies or his method of doing business. "Unless the criminal act is directed against the young, the aged, the handicapped, or unless the victim is chosen because of some unusual personal vulnerability, § 3A1.1[b] cannot be employed." *United States v. Paige*, 923 F.2d 112, 113 (8th Cir. 1991) (internal quotation marks and citations omitted). Application of the vulnerable victim guideline is limited to cases in which the victims "are in need of greater societal protection" and the offenses are thus "more criminally depraved" than they would be otherwise. *Castellanos*, 81 F.3d at 111 (internal citations omitted).

---

[13]The government has never claimed that these offenses were racially motivated hate crimes subject to enhancement under U.S.S.G. § 3A1.1(a).

29

In this case, the victims were not selected because of any "unusual personal vulnerability," nor were they in demonstrably greater need of societal protection than other crime victims. To paraphrase the bank robber Willie Sutton, the victims' stores were targeted because that is where the money was. Their possession of large amounts of cash and their perceived carelessness with it are not grounds for enhancement under the vulnerable victim guideline.

We need not decide whether, in some circumstances, a victim's immigrant status or lack of street smarts might render him "otherwise particularly susceptible" to crime within the meaning of U.S.S.G. § 3A1.1(b). The district court did not rely on this rationale, but on the fact that the victims were Asian-American merchants who handled large bankrolls. A vulnerable victim enhancement based upon the victim's race, employment, and business habits, without more, cannot stand.

IV.  CONCLUSION

Appellant's convictions are AFFIRMED. His sentence is VACATED and the case REMANDED for resentencing.