**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-40237
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

MASONTAE HICKMAN; MARKUS D. CHOPANE; JYI R. McCRAY;
EDWIN T. LIMBRICK; EDMOND GASAWAY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Eastern District of Texas
_____

September 1, 1998

Before HIGGINBOTHAM, PARKER and DENNIS, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellants Masontae Hickman, Edwin T. Limbrick, Jyi R. McCray, Marcus D. Chopane, and Edmond Gasaway appeal their convictions and sentences for conspiracy to obstruct commerce, obstruction of commerce in violation of the Hobbs Act and related firearm counts. We affirm all convictions, and affirm the sentences imposed against Hickman, Limbrick, McCray and Gasaway. We vacate Chopane's

1

sentence and remand his case to the district court for resentencing.

## FACTS AND PROCEEDINGS

This case involved the federal prosecution of five individuals for a series of robberies in a three-county area in East Texas in 1994.[1]  A sixth individual, Roderick Mouton, testified for the Government in return for a plea bargain that allowed him to plead guilty to misprision of a felony.

On March 15, 1994, two men entered the Subway Sandwich Shop in Beaumont, Texas just before closing.  The men, one armed with a shotgun and one with a handgun, demanded money from Subway employee Charles Mitchell.  After receiving $230, they fled.  On May 4, 1994, Mitchell picked defendant Chopane out of a photo lineup as the robber armed with the handgun.  At a subsequent photo lineup, two years later, on May 15, 1996, Mitchell identified defendant McCray as the robber armed with the shotgun.  McCray and Chopane were convicted for this crime.

On April 1, 1994, a robbery occurred at the Church's Chicken restaurant in Jasper, Texas.  That night, Heather Goss, a Church's employee, had just closed the restaurant and was walking to her car when she was accosted by two men, who forced her and a co-worker back inside.  One of the men was armed with a revolver.  The two men ordered Goss to open the store's safe, and they absconded with

---

[1]Appendix A sets out the specific charges, jury verdicts, dates of charged offenses and sentences in chart form.

$1,848.  Several unfired .32 caliber bullets were later recovered at the scene, which had apparently fallen out of the robber's handgun.  Defendant Hickman later admitted to police his involvement in this robbery.  A .32 caliber pistol bearing Hickman's fingerprints was recovered at the scene of a later robbery on June 1, 1994.  The pistol was missing its center pin, a defect that would allow ammunition to drop out of it.  At trial, Hickman was convicted for this crime.

During the evening of April 20, 1994, Oscar Hennington, an employee of Catfish Cabin restaurant in Jasper, Texas, was outside closing up when he was accosted by a man who put a gun to his head.  Hennington saw three other robbers crouched down a short distance away, armed with handguns and a sawed-off shotgun.  LaDonna Scott, another Catfish Cabin employee, walked out of the restaurant and laughed off the robbery as a joke.  The robbers responded by discharging their firearms, causing Scott and Hennington to run to their vehicles which were parked nearby.  Hennington, Scott, and Sadie Crumedy, another employee, fled the restaurant in their cars.  On the side of the highway close to the Catfish Cabin, Hennington saw a white vehicle like the car owned by defendant Limbrick's sister.  Scott, who was Limbrick's sister-in-law, testified at trial that one of the robbers sounded like Limbrick.  Hickman later confessed to police to participating in a robbery of "Catfish King" in Jasper, although the only catfish restaurant in Jasper is Catfish Cabin.  Hickman stated that the robbers left after

3

receiving no money because the victims "wouldn't act right." Hickman and Limbrick were convicted of this crime.

On May 2, 1994, at approximately 9:45 p.m., two men broke into the Peking Restaurant in Beaumont, Texas. During the course of the robbery, the men shot and wounded David Wu and shot and killed Xiao Wu. Hickman later confessed to participation in this crime. Limbrick confessed to driving the getaway car and disassembling the shotgun and placing it in a sack to be thrown away. Gasaway admitted throwing the sack in a river, not knowing what was inside but later recanted his statement. Hickman and Limbrick were convicted for this crime.

At 1:30 a.m. on the morning of May 17, 1994, Richard Roark, the manager of an AutoZone store, was stocking auto parts along with some other employees. Two men armed with guns entered the store and demanded that Roark open the safe. Roark did so, and the men made off with approximately $1300 or $1400. While fleeing from the store, one of the robbers dropped a cash register tray. After Roark picked up the tray, one of the robbers shot at him. Police later recovered a .380 caliber shell casing, which they determined was fired from the same pistol recovered from the subsequent Dairy Queen robbery. Hickman confessed to participation in the AutoZone robbery. Hickman was convicted for this crime.

On May 21, 1994, at approximately 1:00 a.m., two men forced their way into a Church's Chicken on Washington Boulevard in Beaumont, Texas. One man was armed with a gun, the other with a

knife. The men demanded that the employees open the safe, and they escaped with $1,160. Hickman later admitted to robbing a Church's Chicken on "Fourth Street" in Beaumont. Fourth Street is located one block from Washington Boulevard. At trial, Hickman was convicted of this robbery.

At approximately 11:30 p.m. on the night of June 1, 1994, Virginia Willis locked up for the night at the Dairy Queen in Silsbee, Texas, where she was the manager. She walked towards her car in the parking lot carrying the day's proceeds in a bank bag, totaling $1100 in cash and $200 in checks. Before she reached her car, she was accosted by a gunman. She dropped the bag and ran back to the restaurant, but she was pushed into some bushes by a second robber. One of her assailants picked up the bag, put a gun to Willis's face, and demanded to be let inside the restaurant. Willis threw down her keys. As the men left to enter the restaurant, Willis ran to a neighboring convenience store. On her way, Willis saw a maroon vehicle, later identified as Gasaway's Mazda. Roger Smart and a friend were at the convenience store when they heard Willis screaming that she had been robbed. Smart and his friend then got in their pickup truck and followed the maroon vehicle as it sped away from the restaurant. During the pursuit, individuals in the maroon car threw clothing and other objects out its windows. The maroon car later turned into a sand pit. Smart drove past the entrance and down the road to turn around. Smart drove back towards the entrance to the sand pit and observed the

5

maroon car pull out to get back on the highway.  Smart again followed the maroon car at speeds exceeding 95 m.p.h., until his engine exploded.  In the vicinity of the Dairy Queen, a Silsbee police officer later recovered various items of clothing, along with an envelope with the name "Roderick Mouton" on it.  Custer then retrieved two handguns from the sand pit -- a .380 semiautomatic and a .32 caliber revolver.  The .32 revolver was missing its center pin and fingerprints on the gun were identified as Hickman's.  Hickman, McCray and Gasaway were convicted for the Dairy Queen robbery.

On June 21, 1994, four men approached some employees standing outside Hardee's Restaurant in Beaumont, Texas.  The men forced the employees back into the restaurant at gunpoint, and they ordered Clifford Taylor, the manager, to open the safe.  The robbers took approximately $2000 from the safe and fled.  Police officers who were called to the scene discovered Hickman and Mouton hiding 250 yards away.  McCray made it back to the Mouton family home, where he was living.  McCray told Diane Mouton, Roderick Mouton's mother, about the robbery, and he retrieved the proceeds of the crime and gave them to her.  Diane Mouton turned the money over to the police.  Hickman, McCray and Gasaway were convicted of this robbery.

While detained at the Jefferson County Jail, Hickman admitted to participating in the Hardee's, Dairy Queen, Peking Restaurant, Church's Chicken, AutoZone and "Catfish King" robberies.  On June

6

23, 1994, Limbrick admitted to police that he drove the getaway car from the Peking Restaurant robbery and that he disassembled the shotgun used in that crime and placed it in a bag. Limbrick also confessed to driving the getaway car in three robberies preceding the Peking Restaurant.

On October 18, 1996, a federal grand jury returned a third superseding indictment against Hickman, Limbrick, McCray, Chopane, and Gasaway. Limbrick, McCray, Chopane and Gasaway were charged in count one with conspiracy to obstruct interstate commerce by robbery, in violation of 18 U.S.C. § 1951 (the Hobbs Act). Each of the five defendants were then charged individually with various substantive Hobbs Act and firearm-use offenses.

Trial commenced on October 22, 1996. Mouton testified against the defendants as the Government's witness in return for a plea bargain. The jury returned guilty verdicts against the defendants on every count in the indictment, with the exception that Limbrick was acquitted of two of his four Hobbs Act charges and two of his four firearm charges.

In February and March of 1997, the district court sentenced the defendants. Chopane received a total sentence of 111 months of imprisonment, Gasaway received 387 months of imprisonment, McCray received 627 months, Limbrick received 1020 months of imprisonment and Hickman received 3180 months of imprisonment. In addition, the district court imposed terms of supervised release, special assessment and orders of restitution which are not challenged on

7

appeal.  All defendants timely appealed from their convictions.

**ANALYSIS**

### *I. FAILURE TO SEQUESTER CASE AGENTS*

During the trial, the district court permitted Detective Clifton Orr of the Beaumont Police Department to sit at counsel's table along with the FBI case agent, Ed Keeler.  Because both Keeler and Orr were to testify, the defendants objected, invoking Rule 615 of the Federal Rules of Evidence (referred to as "the Rule").  Without making any specific finding, the district court overruled the defendants' objections.  On Appellant Limbrick's request, the district court instructed the two case agents not to discuss the case with the other Government witnesses.  However, they were not precluded from discussing the case with each other.

Rule 615 provides:

Exclusion of Witnesses

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.  This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

We review a district court's compliance with Rule 615 for abuse of discretion, and we will only reverse if the appellants can demonstrate prejudice.  *See United States v. Payan*, 992 F.2d 1387, 1394 (5th Cir. 1993).

8

On appeal, all appellants complain that it was improper for the trial court to excuse Orr and Keeler from sequestration and allow them both to be present in the court room during trial and hear the testimony of witnesses including each other's testimony. Appellants rely on *United States v. Farnham*, 791 F.2d 331 (4th Cir. 1986), in which the Fourth Circuit reversed convictions because two case agents were excused from the Rule, reasoning that the dictates of Rule 615 are mandatory, and not susceptible to trial court discretion or to a strict prejudice requirement. *See id.* at 335. We find *Farnham* neither controlling nor persuasive, especially in light of its explicit rejection of the Fifth Circuit's approach to Rule 615. *See id.* at 335 ("Ignoring the mandatory ('shall') language of the rule, the Fifth Circuit invoked an abuse of discretion standard to uphold a trial court's refusal to exclude one of two . . . case agents from the proceedings . . . . *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981).").

This court has never directly decided whether the Government can designate more than one individual as its representative under Rule 615(2). *See United States v. Payan*, 992 F.2d 1387, 1394 (5th Cir. 1993). But we have approved the use of two case agents at trial, where a second agent's non-exclusion could be justified under the essential-presence exception of Rule 615(3). *See United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. Unit A 1981). The Government argues that the complexity of this case justified a

9

second case agent being excused from the Rule because two agents were essential to the presentation of the case. However, the prosecution did not invoke the third exemption at trial and the district court made no such finding. Further, we are not persuaded that this string of simple armed robberies falls within the ambit of Rule 615(3)'s complexity exception. Because neither the Government nor the district court has articulated a sound basis justifying the exemption of two agents from the requirements of Rule 615 and because, on review of the record, we can discern no such basis, we hold that the district court abused its discretion in overruling the Appellants' objection to the presence of both agents during the trial of this case.

Even so, Appellants have shown no prejudice. The purpose behind the sequestration of witnesses is to discourage and expose fabrication, inaccuracy and collusion, *see* Notes of Advisory Committee on Proposed Rules, and to minimize the opportunity that each witness will have to tailor his testimony. *See United States v. Ramirez*, 963 F.2d 693 (5th Cir. 1992). Orr testified about the AutoZone robbery, the chain of custody of some items of evidence, the arrest of Appellant McCray, various witness statements that were taken and general Beaumont geography. Keeler testified that the incidents charged occurred in the Eastern District of Texas, that there was no "Catfish King" in Jasper, but there was a Catfish Cabin located in Jasper. Keeler also testified concerning a photo

lineup, two uncharged robberies and about the effect of the robberies on interstate commerce. Generally, the two officers testified about different subject matter. In two instances during the cross examination, Keeler directly contradicted testimony given earlier by Orr. Therefore, we find that the two officers' testimony was not "tailored" due to the district court's failure to exclude one of them from the courtroom. In fact, the Appellants have not identified and we cannot discern any prejudice growing out of the district court's error. Therefore, we conclude that there was no reversible error in the district court's decisions regarding Rule 615.

## II. *SUFFICIENCY OF EVIDENCE*

### a. Standard of review

In reviewing appellants' challenges to the sufficiency of the evidence, we must uphold the convictions if a rational juror could have found that the evidence established the essential elements of the crimes charged beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We view the evidence, including all reasonable inferences drawn therefrom and all credibility determinations, in the light most favorable to the jury verdict. *See United States v. Resio-Trejo*, 45 F.3d 907, 910 (5th Cir. 1995). The evidence need not exclude every reasonable hypothesis of innocence. *See United States v. McCord*, 33 F.3d 1434, 1439 (5th Cir. 1994).

11

**b.  Sufficiency of the evidence on the conspiracy counts**

Limbrick, Gasaway and Chopane challenge the sufficiency of the evidence to sustain their convictions for conspiracy to affect interstate commerce, in violation of 18 U.S.C. § 1951.  To sustain the conspiracy conviction, there must be sufficient evidence for a rational juror to conclude that the appellants conspired to obstruct, delay or affect commerce in any way or degree by robbery.  18 U.S.C. § 1915(a).  The jury must find an agreement between two or more persons to commit a crime, and an overt act by one of the conspirators to further the conspiracy.  *See United States v. Stephens*, 964 F.2d 424, 427 (5th Cir. 1992).  Proof of a conspiracy does not require direct evidence of an actual agreement between the co-conspirators, but may be inferred from circumstantial evidence. The Government is not required to prove a conspirator had knowledge of all the details of the conspiracy or even knowledge of each of its members, provided knowledge of the essential elements of the conspiracy is proven.  *See United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980).  A defendant cannot escape criminal responsibility on the grounds he joined the conspiracy after its inception or because he plays a minor role in the total scheme. *Id.*

The Government contends that there existed a general, overarching conspiracy to rob local stores, in which the defendants engaged with varying degrees of participation.  Although none of

12

the defendants participated in all of the eight charged robberies, the various combinations of participants linked all of the defendants together. The Government also points to a similar modus operandi for each robbery, thereby establishing a common scheme (e.g., use of weapons, involvement by two or more robbers, robberies of businesses at night while employees were still on the property).

The conspiracy evidence against Limbrick and Gasaway was strongest. Limbrick confessed to his participation, with others, in the Peking Restaurant robbery, and a witness testified that she recognized his voice at the Catfish Cabin heist. From this evidence, the jury could infer that Limbrick was guilty of conspiracy. According to Mouton, who testified for the Government, Gasaway instigated the Dairy Queen and Hardee's robberies. Mouton's testimony was corroborated by witnesses who saw a vehicle matching Gasaway's leaving the scene of the Dairy Queen robbery, and of witness Jason Gulley who saw Gasaway near Hardee's at the time of that crime.

Although the evidence against Chopane was weaker, the jury was not unreasonable in concluding that he participated in the conspiracy as well. Chopane was convicted only for the Subway Sandwich Shop robbery. Nevertheless, this robbery shared some characteristics with the other crimes: it occurred at night, with a firearm and with another robber. Moreover, McCray, who participated in the Subway heist with Chopane, was convicted of

13

conspiracy as well as three of the substantive robberies.

Viewed in the light most favorable to the verdict, we find the evidence sufficient to support the conspiracy convictions of Limbrick, Gasaway and Chopane.

**c. Sufficiency of the identification evidence against McCray**

McCray argues that the evidence was insufficient to support his conviction for robbing the Subway because his conviction rested on the testimony of a single eyewitness, Mitchell. McCray notes that Mitchell misidentified McCray's relative height, weight, and skin tone, as compared to the other Subway robber, Chopane. Mitchell, however, got a good look at McCray's face during the robbery, and he confidently identified McCray at a photo lineup and at trial. Although Mitchell's identification of McCray was certainly subject to attack, the jury was the ultimate arbiter of Mitchell's credibility and chose to credit his identification. Because Mitchell's identification was not incredible as a matter of law, we will not upset the jury's verdict. *See United States v. Freeman*, 77 F.3d 812, 816 (5th Cir. 1996).

**d. Gasaway's robbery conviction**

Gasaway argues that the Government offered insufficient evidence to tie him to the Dairy Queen and Hardee's robberies. Yet Mouton, acting as Government witness, specifically testified that Gasaway participated in both crimes. "[T]he uncorroborated testimony of an accomplice or co-conspirator can be sufficient to

14

support the verdict." *United States v. Restrepo*, 994 F.2d 173, 182 (5th Cir. 1993). Moreover, Mouton's testimony concerning various details of the Dairy Queen robbery was in fact extensively corroborated by other evidence. As to Gasaway's participation specifically, two other witnesses testified that a photograph of Gasaway's vehicle "looks exactly like the car" and "that's the car" that they saw leaving after the Dairy Queen robbery. The jury also heard Jason Gully testify that on the night of the Hardee's robbery, Gasaway and McCray came to his residence in Gasaway's maroon car excitedly asking about Hickman and Mouton, who had been apprehended by police. A reasonable juror could have determined, based on the evidence presented, that Gasaway either robbed, or aided and abetted the robberies of Dairy Queen and Hardee's. We therefore affirm those convictions.

**e. Gasaway's and Limbrick's Firearm Convictions**

Gasaway and Limbrick contend that there was insufficient evidence to sustain their convictions for using or carrying firearms during the commission of crimes of violence, because the Government never demonstrated that they themselves carried weapons during the charged robberies.

The Government explicitly charged the defendants with aiding and abetting the use of firearms, in violation of 18 U.S.C. §§ 924(c) & 2. Additionally, the trial court gave the jury an aiding and abetting instruction. If we assume for the sake of argument

15

that there was no evidence that Gasaway and Limbrick carried firearms individually, there still exists ample evidence in the record that Gasaway and Limbrick aided others in their use of firearms. They were aware of the existence of the firearms, given the prominent role the guns played in the robberies and the limited number of robbers. Accordingly, their convictions for aiding and abetting were proper. *See United States v. Williams*, 985 F.2d 749, 755 (5th Cir. 1993)(requiring aiders and abettors at least to know that firearms were available to their cohorts during the crime.)

**f. Sufficiency as to the Effects on Interstate Commerce**

The Hobbs Act criminalizes efforts by defendants to obstruct, delay, or affect commerce or the movement of any article in commerce, by robbery or extortion. 18 U.S.C. § 1951(a). The Government presented evidence at trial that all of the victimized businesses either purchased products out-of-state or transferred their profits to out-of-state national headquarters. Appellants Hickman, Chopane and Limbrick all contend, however, that the amounts stolen from the businesses were fairly trivial or that the businesses themselves only had a minor role in interstate commerce. Accordingly, they argue, their crimes fell outside the ambit of the Hobbs Act.

In support of their position, the appellants cite *United States v. Lopez*, 514 U.S. 549 (1995), for the proposition that the Government is required to show that each robbery had a

16

"substantial" effect on interstate commerce in order to support convictions under the Hobbs Act. This circuit has rejected that argument, instead employing the aggregation principle to allow Hobbs Act convictions where the impact of individual robberies on interstate commerce is minimal. In *United States v. Robinson*, 119 F.3d 1205 (5th Cir.), *cert. denied*, 118 S. Ct. 1104 (1997), this court held:

> [I]n Hobbs Act prosecutions based on local activities that affect interstate commerce, the government need not prove that the effect of an individual defendant's conduct was substantial. It suffices to show a slight effect in each case, provided that the defendant's conduct is of a general type which, viewed in the aggregate, affects interstate commerce substantially.

*Id.* at 1208.

A review of Supreme Court authority raises serious questions regarding whether aggregation principles can be used as the commerce clause jurisdictional hook under the Hobbs Act when the underlying crimes arise from a purely local crime spree. Without question, these robberies standing alone, or viewed cumulatively, do not substantially affect commerce. They may not even minimally affect commerce. These local robberies are not the sort of economic activity that can legitimately be viewed in the aggregate for traditional economic impact analysis purposes. The conceptual difference between the consumption of home-grown wheat that might otherwise have been sold on the open market, *see Wickard v. Filburn*, 317 U.S. 111 (1942), or denying service in a restaurant to

17

a particular race of interstate travelers, *see Katzenbach v. McClung*, 379 U.S. 294 (1964), and a string of local robberies is apparent. We, however, are bound by circuit law. *See United States v. Robinson*, 119 F.3d at 1208. *Robinson* constitutes clear circuit precedent for the application of aggregation to this local non-economic activity, thereby setting the commerce clause jurisdictional hook. Unless and until the en banc court intervenes, our choice is clear. Under existing circuit precedent, the jury in this case heard sufficient evidence to support the conclusion that the victims engaged in interstate commerce.

Additionally, Limbrick argues that the Government failed to prove that the Catfish Cabin heist resulted in even a minimal impact on interstate commerce. The record is clear that no money was taken in that robbery. However, § 1951 also covers "attempts" to obstruct interstate commerce, and the appellants were so indicted. Moreover, the district court explicitly charged the jury that Limbrick and Hickman could be convicted on this count if, had their attempts at robbery been successful, the Catfish Cabin's assets would have been at least minimally depleted. The evidence is sufficient to sustain the jury's affirmative answer to this question.

### III. *JURY INSTRUCTIONS REGARDING INTERSTATE COMMERCE*

Hickman contends that the trial court improperly charged the jury regarding the Hobbs Act offenses by instructing them that the

18

Government need only show a minimal impact on interstate commerce. He submits that following *Lopez,* the jury should have been told that it had to find that his actions had a substantial impact on commerce.  Like the sufficiency of evidence argument discussed above, this position is foreclosed by *United States v. Robinson*, 119 F.3d 1205 (5th Cir. 1997).

Hickman also contends that the trial court's instructions on the interstate commerce element of the offense improperly took that element of the crime out of the province of the jury, in violation of *United States v. Gaudin*, 515 U.S. 506 (1995).  Hickman submits that the court's instruction reserved for itself the question of whether Hickman's acts affected interstate commerce; the charge merely asked whether several potential interstate-commerce-affecting events occurred.  Yet as Hickman concedes, in *United States v. Parker,* 104 F.3d 72, 74 (5th Cir.), *cert. denied*, 117 S. Ct. 1720)(1997)(en banc), and *United States v. Miles*, 122 F.3d 235, 239-40 (5th Cir. 1997), *cert. denied* 118 S. Ct. 1201 (1998), this court upheld substantially similar charges against *Gaudin*-style attacks.  Accordingly, Hickman's *Gaudin* argument fails.

## IV.  MOTIONS TO SEVER

### a. Use of redacted confessions

At trial, the Government offered the confessions of Limbrick, McCray and Hickman.  Those confessions mentioned the other co-defendants, including Gasaway and McCray.  The Government redacted

the confessions, blacking out all names except the confessing party but leaving clear references to the fact that other people had participated in the crimes which were the subject of the confessions. Gasaway and McCray moved for severance on the basis of *Bruton v. United States,* 391 U.S. 123 (1968), which held that the admission of incriminating statements by a co-defendant who is not subject to cross-examination can violate the confrontation rights of the non-confessing defendant. Both Gasaway and McCray contend that despite the redactions, it still would have been possible for the jury to infer the identity of the missing names.

Under precedents as they existed at the time of the trial, appellants' *Bruton* arguments fail. This Circuit has held that only statements that directly implicate the defendant create *Bruton* problems. *See United States v. Jinemez*, 77 F.3d 95, 98 (5th Cir. 1996). Statements of co-defendants are properly admitted so long as those statements, standing alone and without reference to other evidence, do not identify or implicate the defendant. *See United States v. Espinoza-Seanez*, 862 F.2d 526, 533-34 (5th Cir. 1988).

However, after the trial and after this case was fully briefed, the Supreme Court, in *Gray v. Maryland,* 118 S. Ct. 1151 (1998), held that introducing, during a joint trial, a confession of a nontestifying co-defendant which has been redacted violated *Bruton* and the Constitution. *Gray* found that redactions that replace a proper name with an obvious blank, the word "delete," a

20

symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results. *See Gray*, 118 S. Ct. at 1156. The confessions admitted in this case, having been redacted by blacking out the co-defendants names with a marker, are exactly the type of evidence found unconstitutional by *Gray.* Therefore, we find that the admission of the confessions was error.

However, *Gray* does not undercut this Circuit's holding that *Bruton* error may be considered harmless when, disregarding the co-defendant's confession, there is otherwise ample evidence against a defendant. *See United States v. Kelly*, 973 F.2d 1145, 1150 (5th Cir. 1992)(recognizing harmless error standard); *United States v. Bobo*, 586 F.2d 355 (5th Cir. 1978)(applying harmless error standard to *Bruton* problems arising out of redacted co-defendant's confession). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). We must determine whether, absent the *Bruton*-tainted confessions, there was a reasonable probability that the defendants would be acquitted. *See United States v. Lewis*, 786 F.2d 1278, 1286 n.11 (5th Cir. 1986). If the "statement's impact is insignificant in light of the weight of other evidence against the defendant," the error is harmless. *See United States v. Basey*, 816 F.2d 980, 1005 (5th Cir. 1987).

21

After our own review of the record and after consideration of what seems to have been the probable impact of the confessions on the minds of a jury, we find, beyond a reasonable doubt, that the evidence was harmless; that is, that it did not prejudicially contribute to the convictions. *See Chapman*, 386 U.S. at 24. The jury heard Mouton testify from personal knowledge about McCray's and Gasaway's involvement. They also heard various pieces of circumstantial evidence linking them to their counts of conviction. Moreover, McCray himself confessed to the Hardee's robbery. We therefore hold that the admission of the redacted confessions, while error, was harmless error.

**b. Motion for severance based on non-*Bruton* reasons**

Gasaway also argues that his trial should have been severed from that of his co-defendants because the portion of the conspiracy for which he was charged was dissimilar to the rest of the scheme. He argues that he was charged with participation in a completely separate crime, requiring the severance of his trial. However, the evidence in the record ties Gasaway to a number of the robberies, making him a major participant in the charged conspiracy. Gasaway has failed to demonstrate that his joint trial prevented the jury from making a reliable judgment. *See United States v. Krout*, 66 F.3d 1420, 1430 (5th Cir. 1995).

Gasaway also claims that his case should have been severed because his defense relating to his lack of knowledge concerning

22

the contents of the bag that he threw away was antagonistic to that of his co-defendants. The test for severance of antagonistic defenses is that the essence or core of the defenses must be in conflict so that a jury, in order to believe one defense, must necessarily disbelieve the core of the other defense. *See United States v. Bruno*, 809 F.2d 1097, 1103 (5th Cir. 1987). Gasaway's position concerning the contents of the bag did not impact the core of his or his co-defendant's defenses. We therefore conclude that the district court did not abuse its discretion in denying Gasaway's motion for severance. *See United States v. Leal*, 74 F.3d 600, 605 (5th Cir. 1996).

## V. IDENTIFICATION OF CONFIDENTIAL INFORMANT

Police first identified Chopane as a suspect based on information from a confidential informant who indicated that Chopane had participated in several robberies in the area. Acting on this tip, the police placed Chopane's picture in a photo lineup. Apparently, the confidential informant had no involvement in Chopane's crimes; he merely passed on information he had acquired in the community. Chopane contends on appeal that the trial court erred in failing to provide him with the identity of the informant, so as to allow Chopane to prepare his defense.

In *Roviaro v. United States*, 353 U.S. 53, 60 (1957), the Supreme Court recognized that the Government possesses a privilege to keep confidential the names of informants, but that this

23

privilege should yield, under certain circumstances, to a defendant's due process rights. This circuit has crafted a three-part test in the wake of *Roviaro* to determine whether disclosure of a confidential informant's identity is necessary. We examine: 1) the informant's degree of involvement in the crime; 2) the helpfulness of the disclosure to the defense; and 3) the Government's interest in nondisclosure. *See United States v. Sanchez*, 988 F.2d 1384, 1391 (5th Cir. 1993). As to the first prong, we have held that mere "tipsters" are not so closely related to a crime as to require the disclosure of their identity. *See United States v. Cooper*, 949 F.2d 737, 749 (5th Cir. 1991). Here, the evidence supported the conclusion that the confidential information was simply a tip. Second, Chopane has demonstrated no need for the informant's identity; as the informant was merely passing a tip, and his tip was not relied upon at trial to convict Chopane, that tip could not foreseeably assist Chopane in his defense. Third, the district court had some evidence that Chopane was dangerous. Evidence at a pretrial hearing on Chopane's motion to disclose the informant's identity included photographs recovered by law enforcement showing Chopane pointing a sawed-off shotgun at the camera and holding a pistol to his own head. This evidence gives rise to a legitimate concern that the informant's life might be jeopardized were his identity revealed. We therefore conclude that the district court did not abuse its discretion in denying

24

Chopane's motion to reveal the identity of the informant.

## VI. *DID LINEUP TAINT THE IN-COURT IDENTIFICATION?*

Charles Mitchell, a Subway employee, later identified both McCray and Chopane as the men who robbed his store. McCray and Chopane now challenge the district court's decision to admit his identification testimony.

Whether identification evidence is admissible at trial is a mixed question of law and fact subject to de novo review, but the district court's underlying factual findings are reviewed for clear error. *See United States v. Fletcher*, 121 F.3d 187, 194 (5th Cir.), *cert. denied*, 118 S. Ct. 640 (1997).

The admissibility of eyewitness identification at trial following a pretrial identification from a photo lineup is governed by a two-step analysis. First, we ask whether the lineup was impermissibly suggestive; second, if it was so suggestive, we consider whether the lineup led to a substantial likelihood of a misidentification. *See Simmons v. United States*, 390 U.S. 377, 384 (1968).

### a. Chopane

Before Mitchell participated in the photo lineup, he indicated that one of the robbers wore a "Starter" jacket. Chopane was the only person in the lineup photos wearing such a jacket. Further, Chopane's picture, unlike the others, was taped over another picture. Given the combination of these two factors, it is

25

possible that the lineup could have impermissibly drawn Mitchell's attention to Chopane's picture.

Assuming that Chopane's lineup was impermissibly suggestive, we must next determine whether Mitchell's resulting identification was unreliable. In assessing the second step of the test, this court looks to six factors to determine whether an impermissibly suggestive lineup led to a substantial likelihood of irreparable misidentification. We consider: 1) the opportunity of the witness to view the criminal; 2) the witness's degree of attention; 3) the accuracy of the pre-identification description; 4) the witness's level of certainty; 5) the elapsed time between the crime and the identification; and 6) the corrupting influence of the suggestive identification. *See United States v. Merkt*, 794 F.2d 950, 958 (5th Cir. 1986).

First, Mitchell was able to view the robber for a minute to a minute and a half in good lighting. Second, as the victim of the robbery, Mitchell's attention was drawn to the face of his assailant. Mitchell stated at the suppression hearing: "You just don't forget a person that's pointed a gun at you." Third, Mitchell's pre-identification description of Chopane was accurate in part and inaccurate in part. Although reasonably close, Mitchell stated that Chopane was taller than he actually is. Fourth, Mitchell quickly and confidently identified Chopane when he viewed the lineup, and he has never wavered in his identification.

26

Fifth, only three months passed between the crime and his identification, not a particularly long period of time. Finally, it is unlikely that the lineup had a corrupting influence on Mitchell's identification, as Mitchell was very confident in his in-court identification and testified to the fact that he did not rely upon the jacket that Chopane was wearing in identifying Chopane's photo.

### b. McCray

As to the identification of McCray, the lineup was not impermissibly suggestive. The only complaint McCray has about his lineup was that his picture was in the second spot. McCray notes that the police told Mitchell to identify the "second man who robbed him," which he interprets to be an instruction to Mitchell to pick the second photo in the lineup. McCray also complains that Chopane's picture had likewise been in the second spot. McCray's lineup was the second lineup attended by Mitchell; clearly, Mitchell understood the police's instruction to mean that he should pick the second man that had robbed him, not that he was to pick the photo in the second spot. We conclude that McCray has not established that his lineup was impermissibly suggestive.

We therefore conclude that the district court did not err in admitting Mitchell's trial identification of Chopane and McCray.

### VII. COMPENSATED WITNESS JURY INSTRUCTION

Roderick Mouton testified for the Government against the

27

defendants as part of his plea agreement. The district court informed the jury about his plea agreement and instructed them to consider his testimony with "caution" and "great care." McCray complains on appeal that the district court failed to give the jury a "compensated witness" instruction concerning Mouton's suspect credibility. Because McCray failed to request such an instruction from the trial court, we employ the plain error standard of review. *See United States v. Reyes*, 102 F.3d 1361, 1364 (5th Cir. 1996). The specific "compensated witness" instruction that McCray argues he is entitled to applies to witnesses who are paid a fee for their testimony, not to those who, like Mouton, receive a reduced sentence. *See United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987). We therefore conclude that the district court's instruction cautioning the jury about Mouton's credibility was not plain error.

## VIII   *SUBJECT MATTER JURISDICTION OVER STATE COURT EVIDENCE*

Limbrick argues that the federal courts lacked jurisdiction to try him because they relied on evidence collected by the State of Texas in a capital murder investigation. He cites *Palmer v. Texas*, 212 U.S. 118 (1909), which stands for the proposition that federal courts cannot interfere with property subject to state court jurisdiction. Here, the state investigated Limbrick, but dropped its charges against him in deference to the federal proceeding. We conclude that the federal court properly exercised jurisdiction

28

over Limbrick's crime.

*IX SENTENCING ISSUES*

## a. Standard of review

We examine factual findings subject to the "clearly erroneous" standard mandated by 18 U.S.C. § 3742(e), and accord great deference to the trial judge's application of the sentencing guidelines. *See United States v. Humphrey*, 7 F.3d 1186, 1189 (5th Cir. 1993). However, a sentence imposed as a result of an incorrect application of the sentencing guidelines must be reversed. *Id.*

## b. Enhancements for Restraint and Abduction of Victims

The district court increased Chopane's base offense level by two levels because he had "physically restrained" victims during the Subway robbery. *See* U.S.S.G. § 2B3.1(b)(4)(B). Hickman's base offense level was increased four levels because he "abducted" victims during the robberies of AutoZone and Church's Chicken. *See* U.S.S.G. § 2B3.1(b)(4)(A). Chopane and Hickman objected to the enhancements at their respective sentencings and now press for relief on appeal.

U.S.S.G. § 2B3.1(b)(4) provides:

(4)  (A) If any person was abducted to facilitate commission of the offense or to facilitate escape, increase by **4** levels; or (B) if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by **2** levels.

"Physically restrained" is defined earlier in the Guidelines as

"the forcible restraint of the victim such as by being tied, bound, or locked up."  U.S.S.G. § 1B1.1, comment. (n.1(i)).  "Abduct" is defined as "a victim was forced to accompany an offender to a different location.  For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute abduction."  U.S.S.G. § 1B1.1, comment. (n.1(a)).

Chopane argues that he never tied, bound, or locked up the victims of the robberies.  Rather, he contends that at best the evidence only demonstrated that he "tapped" a Subway employee on the shoulder with a gun.  However, the district court reasoned that Chopane's pointing of a firearm at the employee restricted her movement.

The resolution of Chopane's sentencing challenge turns on the interpretation of the definition of "physical restraint."  The Guidelines define the term to include acts "such as being tied, bound or locked up."  Although we have never reached this question, those circuits which have reached it have been unanimous in concluding that "[b]y the use of the words 'such as,' it is apparent that 'being tied, bound or locked up' are listed by way of example rather than limitation."  *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989); *see also United States v. Rosario*, 7 F.3d 319, 320-21 (2nd Cir. 1993); *United States v. Doubet,* 969 F.2d 341, 346 (7th Cir. 1992); *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991); *United States v. Roberts*, 898 F.2d

1465, 1468 (10th Cir. 1990). We agree that it is possible for a district court to conclude that a defendant physically restrained his victims without evidence that he actually tied, bound, or locked them up.

The evidence supporting the district court's § 2B3.1(b)(4)(B) finding as to Chopane showed that Chopane pointed a firearm at the Subway employee during the robbery. The Government argues that this action carried an implicit threat to obey his command or be shot and was enough to support a finding of physical restraint. The Government points to cases from other circuits implying that restraint need not encompass the use of actual physical force, so long as the defendant's actions permitted no alternative but compliance. *See United States v. Kirtley*, 986 F.2d 285, 286 (8th Cir. 1993); *Doubet*, 969 F.2d at 347. However, the cases from other courts construing § 2B3.1(b)(4)(B) do not support the Government's position. Physical restraint has been upheld in various circumstances involving either the physical holding of the victim or the confining of the victim in some manner coupled with a threat of violence. *See, e.g., Rosario*, 7 F.3d at 321 (defendant stood on victim's throat); *United States v. Foppe*, 993 F.2d 1444, 1452-53 (9th Cir. 1993)(defendant dragged and grabbed victims); *Kirtley*, 986 F.2d at 286 (defendant ordered victims at gunpoint to bind themselves); *Doubet*, 969 F.2d at 346 (defendant herded victims into an enclosed room at gunpoint); *Arcoren*, 929 F.2d at 1246 (defendant

31

pushed and grabbed victims to prevent them from leaving bedroom; *Roberts*, 898 F.2d at 1470 (defendant put right arm around victim and held knife to victim's face). Even the recent Ninth Circuit case, *United States v. Thompson*, 109 F.3d 639, 641 (9th Cir. 1997), which contained language indicating that physical restraint occurs anytime a victim has a gun pointed at her and is ordered to do something, involved the defendant forcing one victim to lie down on the floor and forcing another to walk a short distance at gunpoint.

Although Chopane's actions permitted no alternative but compliance, he did nothing to restrain his victim that an armed robber would not normally do. As the Seventh Circuit has noted, merely brandishing a weapon at a victim cannot support an enhancement under this section of the Guidelines, because, "[w]ere it otherwise, enhancement would be warranted every time an armed robber entered a bank, for a threat not to move is implicit in the very nature of armed robbery." *Doubet*, 969 F.2d at 346. We therefore conclude that the district court erred in concluding that Chopane "physically restrained" his victim as contemplated by the Guidelines. Were we to rule otherwise, there would be no limiting principle on the application of this enhancement; every armed robbery would be enhanced by the physical restraint provision.

Next, we must determine whether the court erred in determining that Hickman abducted his victims. The district court found that the victims in the Jasper Church's Chicken and Hardee's robberies

32

"were initially accosted in the parking lots and then forced back into the restaurant by the robbers[.]"

The district court cited *United States v. Hawkins*, 87 F.3d 722, 726-28 (5th Cir. 1996) to support its finding that Hickman abducted his victims during these two robberies. In *Hawkins*, the defendants beat the victims at one location in a parking lot and then dragged them at gunpoint 40 or 50 yards away. *Id.* We upheld a four level sentence enhancement in that situation, pointing out that it was not necessary to cross a property line or the threshold of a building to establish a change of location. *Id.* The term "a different location" must be interpreted on a case by case basis, considering the particular facts under scrutiny, not mechanically, based on the presence or absence of doorways, lot lines, thresholds, and the like. *Id.* We cannot say that the district court erred in applying the four-level abduction enhancement, as interpreted by *Hawkins*, to Hickman under the facts of this case.

## c. Imposition of consecutive sentences on Hickman

The district court imposed consecutive sentences on Hickman pursuant to 18 U.S.C. § 924(c), which provides for twenty year consecutive sentences for individuals convicted of second or subsequent firearms offenses. Hickman was convicted of multiple firearms offenses in this trial, but he argues that § 924(c) only permits consecutive sentencing when the prior convictions have previously been entered as final judgments. As Hickman concedes,

33

in *United States v. Deal*, 508 U.S. 129 (1993), the Supreme court specifically rejected this argument and approved of the sentencing approach taken by the district court below.

Hickman contends further that even if his later convictions under § 924(c) can run consecutively to his first conviction, those later convictions cannot run consecutively to each other. Yet the statute explicitly states that sentences imposed under § 924(c) cannot run concurrently with any other sentences. *See* 18 U.S.C. § 924(c)(1). Logically, that prohibition includes other § 924(c) sentences as well, a conclusion that has been reached by other circuits. *See, e.g., United States v. Wright*, 33 F.3d 1349, 1340 (11th Cir. 1994); *United States v. Fontanilla*, 849 F.2d 1257, 1258 (9th Cir. 1988). We therefore conclude that the district court did not err in imposing consecutive sentences for Hickman's § 924(c) convictions.

### d. Sentencing enhancement for obstruction of justice

Section 3C1.1 of the Sentencing Guidelines provides that:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by two levels.

U.S.S.G. § 3C1.1. Destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation is an example of conduct to which the enhancement applies. U.S.S.G. § 3C1.1, comment. (n.

34

1(d)).

The district court imposed a two-level enhancement to Hickman's base offense level for obstruction of justice, *see* U.S.S.G. § 3C1.1, because Hickman and others dismantled the shotgun used in the Peking Restaurant robbery/murder. Hickman objects to this enhancement under *United States v. Lister*, 53 F.3d 66, 71 (5th Cir. 1995), in which we held that the obstruction of justice enhancement should apply only to those cases where misconduct occurs with the defendant's knowledge of an investigation or, at least, with the defendant's correct belief that an investigation is probably underway. Hickman argues that the Government produced no evidence that he was aware of an investigation of the Peking Restaurant crime when he and his cohorts dismantled the weapon. The district court, however, made ample findings to support its imposition of the obstruction enhancement. There was evidence before the court that the shotgun was dismantled and thrown into a river four days after the crime. In the interim, Hickman and McCray read a newspaper article concerning the Peking Restaurant heist. Moreover, Limbrick viewed a television report about the crime and discussed it with Hickman. It was permissible for the district court to infer from this evidence that Hickman was aware of the investigation into the crime or at least had a correct belief that an investigation was probably underway. *See Lister*, 53 F.3d at 71. We therefore conclude that the district court did not

err in imposing a two level enhancement to Hickman's base offense level for obstruction of justice.

## e. Use of murder in calculating Hickman's sentence

Hickman contends that the district court improperly calculated his base offense level for the Peking Restaurant crime. The court set his offense level at 43, relying on U.S.S.G. §§ 2B3.1(c)(1) and 2A1.1, which provide the base offense level for murder. Hickman argues that the murder guideline should not have been applied to his case because he was not the triggerman and it was not reasonably foreseeable that someone would be killed during the crime. He further contends that he was not charged with conspiracy for this specific crime, so he should not be held responsible for the crimes of his co-defendants under the *Pinkerton* doctrine. *See Pinkerton v. United States,* 328 U.S. 640 (1946).

Section 1B1.3(a)(1)(B) of the Guidelines provides that defendants may be sentenced for all foreseeable conduct that occurs as a part of a jointly undertaken criminal activity, even if no conspiracy is charged. Hickman's argument that the murder was unforeseeable is specious. Prior to the Peking Restaurant crime, Hickman had participated in various robberies in which guns were brandished and shots were fired. Moreover, the perpetrators of the Peking Restaurant offense openly utilized loaded firearms. Hickman clearly should have understood that the brazen use of loaded

36

firearms might lead to the death of a victim. Indeed, application Note 2 to U.S.S.G. § 1B1.3 details almost an identical situation where one robber should be held responsible for the murder committed by a fellow robber in the course of the robbery. The district court did not err using the murder component in calculating Hickman's base offense level.

## CONCLUSION

For the foregoing reasons, we affirm all the counts of conviction against all appellants. We vacate Chopane's sentence, and remand Chopane to the district court for resentencing. We affirm the sentences imposed as to the other appellants.

**AFFIRMED IN PART. VACATED AND REMANDED IN PART.**

| Defendant | Conspiracy I | Subway II/III 3/14/94 | Church's Chicken Jasper IV/V 4/1/94 | Catfish Cabin VI/VIII 5/2/94 | Peking Restaurant VIII/IX 5/2/94 | AutoZone X/XI 5/17/94 | Church's Chicken Beaumont XII/XIII 5/21/94 | Dairy Queen XIV/XV 6/1/94 | Hardee's XVI/XVII 6/21/94 | Sentences |
|---|---|---|---|---|---|---|---|---|---|---|
| Hickman | | | Hobbs/ Gun Count | Hobbs/ Gun Count | Hobbs/ Gun Count | Hobbs/ Gun Count | Hobbs/ Gun Count | Hobbs/ Gun Count | Hobbs/ Gun Count | 3180 |
| Limbrick | Guilty - Conspiracy | Not Guilty | Not Guilty | Hobbs/ Gun Count | Hobbs/ Gun Count | | | | | 1020 |
| McCray | Guilty - Conspiracy | Hobbs/ Gun Count | | | | | | Hobbs/ Gun Count | Hobbs/ Gun Count | 627 |
| Chopane | Guilty - Conspiracy | Hobbs/ Gun Count | | | | | | | | 111 |
| Gasaway | Guilty - Conspiracy | | | | | | | Hobbs/ Gun Count | Hobbs/ Gun Count | 387 |

| Notes | | $230 | $1,848 | $0 | $0 | $1,300 | $1,160 | Maroon | $2,000 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2 robbers | 2 robbers | White Car | White Car | 2 robbers | 2 robbers | Car | 4 robbers | |
| | | | | 4 robbers | 2 robbers | | | 2 robbers | | |
| | | | | | Death & Injury | | | | | |

\* Mouton – Pleaded guilty to misprision of felony, testified for government at trial.