REVISED - September 18, 2001

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 00-10569**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**JAMES MCFARLAND, JR.,**

**Defendant-Appellant.**

---

Appeal from the United States District Court
For the Northern District of Texas

---

August 29, 2001

Before GARWOOD, JOLLY, and DeMOSS, Circuit Judges.

PER CURIAM:

On four different dates in a one month period in 1998, James W. McFarland ("McFarland") robbed four different retail convenience stores operated by four different owners at four different locations in the City of Ft. Worth, Texas. His modus operandi was extremely simple: enter the store and pretend to look for something to buy; when he was the only customer in the store, approach the clerk at the cash register and pull out a .25 caliber pistol;

instruct the clerk to open the cash drawer and then lay down on the floor; reach in and grab all of the paper currency in the cash drawer; and tell the clerk to stay on the floor for five minutes and walk out the door. The dollar amount of his take at each store was modest: at Quick Way Shopping, he got $50; at Buy Low, he got $100; at Jeff Stop, he got $145; and at Gateway Liquor, he got somewhere between $1,500 and $2,000. In each case, the clerk victim called 911 and reported the robberies to the Ft. Worth Police Department which conducted an investigation and ultimately arrested and jailed McFarland on charges of robbery under state law. However, instead of being prosecuted by the State as would the perpetrators of hundreds of other similar robberies which occurred in the City of Ft. Worth in that year, McFarland was treated differently. Through the alchemy of federal prosecutorial discretion, a federal grand jury indicted McFarland for a count of "interference with interstate commerce by robbery" (Hobbs Act) and a count for use of a firearm in commission of a federal felony (gun count) on each of the four robberies. He was tried before a jury in federal court and found guilty on all counts. On each of the Hobbs Act counts, he was sentenced to 210 months in prison, to be served concurrently with the other Hobbs Act sentences. On the first gun count, he was sentenced to 60 months and, on each of the remaining three gun counts, he was sentenced to 300 months, all of such gun count sentences to be served consecutive to the Hobbs Act counts and consecutive to each other, as mandated by the United

2

States Congress.  As a result, his total sentence to be served is 1,170 months.  Since federal sentencing does not contain any provision for parole, McFarland will serve 97 and one-half years, less any small percentage reduction as he may earn by good behavior.  In contrast, under Texas law, McFarland could have been sentenced to as little as five years.[1]  And, regardless of the length of his sentence, he would have been eligible for parole after serving half his sentence, or 30 years, whichever was less. *See* TEX. CODE CRIM. PROC. art. 37.07, sec. 4(a).  By prosecuting these crimes in the federal system, McFarland has received, in effect, a life sentence without parole.

McFarland appeals, asserting that the application of the Hobbs Act to these local robberies is unconstitutional, and citing particularly the recent decisions of the United States Supreme Court in *United States v. Jones*[2] and *United States v. Morrison*.[3] This is not the first occasion on which this Court has agonized over the propriety of the gambit of prosecuting criminal conduct which has historically and traditionally been prosecuted under the state system as a federal crime in order to maximize punishment. In *United States v. Hickman*, 151 F.3d 446 (5th Cir. 1998), another

---

[1]  Aggravated robbery under Texas law is a first degree felony, TEX. PEN. CODE § 29.03(b), and carries a punishment of a minimum of 5 and a maximum of 99 years.  TEX. PEN. CODE § 12.32.

[2]  529 U.S. 848 (2000).

[3]  529 U.S. 598 (2000).

panel of this Court addressed factual circumstances amazingly similar and raising the same constitutional issues.  The *Hickman* panel concluded that they were bound by existing Circuit precedent in *United States v. Robinson*, 119 F.3d 1205 (5th Cir. 1997), which held:

> We find the reasoning of *Bolton* unassailable. We agree that under the third category of the commerce power described in *Lopez*, the particular conduct at issue in any given case need not have a substantial effect upon interstate commerce. Congress is free to act -- and the government to apply the law -- so long as the regulated activity, in the aggregate, could reasonably be thought to substantially affect interstate commerce.
>
> Appellant's as-applied challenge to the Hobbs Act collapses in the face of the aggregation principle.  Every robbery or act of extortion in violation of the Hobbs Act must have an effect on interstate commerce; the Act's express jurisdictional element ensures this.  It follows with the inexorable logic of the multiplication table that the cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce.

*Id.* at 1215.  A majority of the active judges of this Court voted to reconsider the *Hickman* decision en banc; but that en banc reconsideration resulted in a tie vote among the judges participating in that reconsideration, which left the *Robinson* panel decision in place as the binding precedent for this Circuit. *See* *United States v. Hickman*, 179 F.3d 230 (5th Cir. 1999). McFarland urges us to read the Supreme Court's language in *Jones* and *Morrison* as being clear enough and sufficiently on point for

4

this panel to reach a conclusion different from the existing Circuit precedent in *Robinson*. But neither *Jones* nor *Morrison* dealt with the Hobbs Act which is the heart of this continuing controversy. And this Circuit has followed a tradition and custom of a rule of orderliness which precludes a subsequent panel from disregarding the holding of a prior panel unless that prior holding has been changed by an intervening en banc decision of this Court or by a Supreme Court decision. While the tie vote on en banc reconsideration in *Hickman* certainly indicates that this Court sitting en banc has not finally resolved the question of the constitutionality of applying the Hobbs Act to criminal conduct which has traditionally been prosecuted as a matter of State responsibility, this panel nevertheless considers itself obligated to adhere to the Circuit precedent in *Robinson* and, therefore, we affirm the convictions and sentences against McFarland in this appeal.

ENDRECORD

DeMOSS, specially concurring:

I concur in the conclusion reached by the panel that our rule of orderliness and considerations of collegiality within the Court require our adherence to the Circuit precedents in **Robinson** unless and until changed by an en banc decision. I write separately to advise the parties and the rest of the Court that, in due course after issuance of this opinion, I will timely hold the mandate and call for a ballot for en banc reconsideration. I will take this action for the following reasons:

1. I think it is unhealthy to have a Circuit precedent hanging by the slender thread of an en banc tie vote; and as a matter of Court policy we should work to reach a definitive conclusion, one way or the other, on that Circuit precedent as soon as possible.

2. In our en banc reconsideration in **Hickman**, we had before us only the Supreme Court decision in **Lopez** as a guide for testing the power of Congress under the Interstate Commerce clause to regulate intrastate activities. There are some commentators who think that **Lopez** was "an aberration" or "a single shot decision" or a "flash in the pan" or "was unlikely to be applied in any other context." But the decision of the Supreme Court in **Morrison** clearly shows that such characterizations are incorrect. In **Morrison**, the Supreme Court reaffirmed, readopted, and reapplied all of the key holdings of **Lopez**, particularly those relating to the third prong of **Lopez** giving Congress the power to regulate

"activities which substantially affect interstate commerce."  I would hope, therefore, that some of my colleagues who concluded in *Hickman* that *Lopez* was not a sufficient basis for changing our Circuit precedent, would, in light of *Morrison*, at least be willing to reconsider that conclusion.

    3.    In two respects I would suggest that the language of *Morrison* directly undercuts the foundation of this Circuit's precedent in *Robinson*.  First of all, the Supreme Court stated:

> We accordingly reject the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.

120 S.Ct. at 1754.  Our Circuit precedent in *Robinson* stands or falls on the validity of its conclusion that the aggregate effect of all robberies on convenience stores may justify the application of the Hobbs Act to those robberies.

    Secondly, in *Morrison* the Supreme Court undercut *Robinson* by stating:

> Gender motivated crimes of violence are not in any sense of the phrase economic activity.

120 S.Ct. at 1751.  This conclusion is similar to the one reached by the Supreme Court in *Lopez* where it held that possession of a gun in the vicinity of a school was not in any sense of the word an economic activity.  In *Morrison* the Supreme Court went on to state:

> Indeed, if Congress may regulate gender motivated violence, it would be able to regulate murder or any other type of violence since gender motivated

7

> violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

120 S.Ct. at 1753. I can see no rational basis upon which the robberies perpetrated here in *McFarland* could be categorized as an "economic activity" in light of these statements from *Morrison*.

4.    The last statement of the Supreme Court in *Morrison* which I think is particularly relevant to our decisions here in *McFarland* is:

> The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce, has always been the province of the states.

120 S.Ct. at 1754. It is beyond dispute that the retail convenience stores involved as victims of the robberies in this case were not instrumentalities or channels of interstate commerce. I would submit that the paper currency in the cash drawer of a cash register in one of these stores is not "goods involved in interstate commerce." The currency in the cash drawer is money, a medium of exchange. The money gets in the cash drawer because a customer brings it in and exchanges that money for some "goods" which he desires to purchase.[4] This purchase transaction is a sale

---

[4]  This distinction between "goods" and "money" is recognized by the Uniform Commercial Code which defines "goods" as "all things (including specially manufactured goods) which are moveable at the time of identification of the contract for sale *other than the money in which the price is to be paid*." U.C.C. § 2-105 (emphasis added).

8

to the ultimate consumer of those "goods or commodities" and is the final transaction by which those goods or commodities become the personal property of the purchaser and leave any channel of interstate commerce which they may have been in prior to that moment. Since McFarland took only cash from the cash drawer, I would suggest that his robbery was not directed at "goods involved in interstate commerce"; and, therefore, this language from *Morrison* gives us another basis upon which to distinguish this case.

5.    Finally, I would urge the members of this Court to read again the dissent filed by Judge Higginbotham to the en banc tie vote decision in *Hickman*. 179 F.3d at 231 (Higginbotham, J., dissenting). This dissent is a comprehensive and masterful treatment of all of the various issues which have been raised as to when Congress may regulate activities under the third prong of *Lopez*, which "substantially affect interstate commerce." While Judge Higginbotham's dissent was written one year prior to the Supreme Court decision in *Morrison*, you will be surprised on re-reading to see how comfortably his analysis, reasoning and language fit on the aegis of the language of the Supreme Court in *Morrison*.