IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-40237
_____


UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,

v.

MASONTAE HICKMAN; MARKUS D CHOPANE; JYI R MCCRAY;
EDWIN T LIMBRICK; EDMOND GASAWAY,

                    Defendants-Appellants.

_____

Appeals from the United States District Court
for the Eastern District of Texas
_____

June 21, 1999

Before KING, Chief Judge, and POLITZ, JOLLY, HIGGINBOTHAM, DAVIS,
JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS,
BENAVIDES, STEWART, PARKER and DENNIS, Circuit Judges.

PER CURIAM:

    By reason of an equally divided en banc court, we affirm all
the counts of conviction against all appellants, and we affirm
the sentences of all appellants except Chopane.  For the reasons
relating to Chopane's sentence set out in the panel opinion, see
United States v. Hickman, 151 F.3d 446, 460-62 (5th Cir. 1998),
reh'g granted and opinion vacated, 165 F.3d 1020 (5th Cir. 1999),
we unanimously vacate Chopane's sentence and remand for
resentencing.

HIGGINBOTHAM, Circuit Judge, with whom JOLLY, JONES, SMITH, DUHE', BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit Judges, join, dissenting.

Between March and June 1994, various combinations of the appellants robbed a Subway Sandwich Shop in Beaumont of $230, a Church's Chicken restaurant in Jasper of $1848, an AutoZone automobile parts store in Beaumont of at least $1300, a Church's Chicken restaurant in Beaumont of $1160, a Dairy Queen restaurant in Silsbee of $1300, and a Hardee's restaurant in Beaumont of $2000. An additional robbery was unsuccessful. When the robberies escalated to a killing, they drew attention in deep East Texas. Although state charges were filed, the United States Attorney obtained federal indictments. The state charges were then not pursued. Equally divided, the court today affirms convictions under the Hobbs Act for these purely local robberies.

I

We believe that the Hobbs Act prosecutions exceeded Congress's authority, and we respectfully dissent from this aspect of the court's judgment.[1] Our concern today is not with the settled principle that Congress may regulate criminal conduct with a substantial effect on interstate commerce. Our difficulty

---

[1]We have no quarrel with the court's decision to follow the panel opinion by vacating Chopane's sentence and remanding for resentencing.

is rather with what counts in determining substantial effect. We would hold that substantial effects upon interstate commerce may not be achieved by aggregating diverse, separate individual instances of intrastate activity where there is no rational basis for finding sufficient connections among them. Of course, Congress may protect, enhance, or restrict some particular interstate economic market, such as those in wheat, credit, minority travel, abortion service, illegal drugs, and the like, and Congress may regulate intrastate activity as part of a broader scheme. The Hobbs Act is not a regulation of any relevant interstate economic market, nor are there other rational connections among nationwide robberies that would entitle Congress to make federal crimes of them all.

The Hobbs Act does not target any class of product, process, or market, or indeed even commercial victims. It facially applies to any robbery, or its attempt, of any person or entity. Taking a child's lemonade is as potentially covered as any other robbery, at least as long as we are free to aggregate all robberies. The Hobbs Act offers no "regulatory scheme" which "could be undercut" if individual robberies were not aggregated. United States v. Lopez, 514 U.S. 549, 561 (1995). Thus, putting aside robberies as part of an effort to regulate particular interstate markets such as guns, drugs, or organized crime syndicates, a local robbery spree can be within Congress's power only if it by itself has a substantial effect.

4

If one could aggregate robberies under the Hobbs Act to satisfy the constitutional demand of a substantial effect on commerce, there would be no reason one could not aggregate murders, or other felonies, to sustain general federal jurisdiction over all crimes. A great reduction in crimes generally would obviously have a cumulatively large effect on interstate commerce. As Chief Justice Marshall said in Cohens v. Virginia, 19 U.S. (6 Wheat) 264 (1821), however, "Congress has . . . no general right to punish murder committed within any of the states," and "[i]t is clear, that Congress cannot punish felonies generally." Id. at 426, 428. Without some judicially enforceable outer limits to the aggregation theory, "it is difficult to perceive any limitation on federal power, even in areas such as law enforcement . . . where States historically have been sovereign." Lopez, 514 U.S. at 566.

The government offers no assistance in any effort to locate the limits of its power. The Solicitor General did not offer in brief or oral argument any principled limit upon federal authority to prosecute local robbery or the taking of money by force – even from a hypothetical five-year-old's lemonade stand. Although the government conceded that the Supreme Court reaffirmed in Lopez that there are limits, it claimed to be unable to locate those limits beyond the redoubt that at some point the nexus to interstate commerce becomes too attenuated.

5

We think that the tie that binds together disparate activities must be made of stronger stuff.  Aggregation demands connection. The principles that we are about to describe are no more than the underlying theme of past decisions, the by-product of an effort to find a coherent path that connects them and would justify myriad federal regulatory schemes.  Its modesty aside, we believe that it offers a principled and judicially enforceable limit.

II

As the Supreme Court summarized in Lopez, there are "three broad categories of activity that Congress may regulate under its commerce power." 514 U.S. at 558.  "First, Congress may regulate the use of the channels of interstate commerce." Id.  This power is inapplicable here.  A robbery victim, unlike a river or highway, does not ordinarily provide a means by which goods can move.  "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." Id.  This is also inapplicable, because even when a robbery victim is a store, a store is not an instrumentality of commerce, like a boat or a car, and, though it does business in interstate commerce, it is not itself in interstate commerce.

The third category is the one we must address with the greatest care here.  The grant of authority to Congress, by the

6

Commerce Clause, "includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." Id. at 558-59 (citation omitted).  Yet it is not always necessary that the activities of the parties to the litigation themselves substantially affect commerce.  Since Wickard v. Filburn, 317 U.S. 111 (1942), the Supreme Court has recognized an aggregation principle, by which Congress may reach an instance of an activity that itself does not "substantially affect" commerce if a myriad of such instances in the aggregate have a substantial effect.

This principle, though, does not explain what activities can be aggregated when we are to add the effects of discrete acts. We recognize the dangers of undue abstraction, but without some account of what it means to aggregate, the aggregation principle becomes disconnected from the root idea that some individual acts can be regulated because they are meaningfully part of some greater whole.  We would hold that activities may be aggregated where the interactive play of their effects is such that regulation requires the ability to reach individual instances of the activity to be effective.

The keystone is not similarity in some essentialist sense. Whatever the strength of Professor Westen's observations about the concept of equality, the concept of similarity is "both empty and confusing: 'empty' in that it derives its entire meaning from normative standards that logically precede it; 'confusing' in

7

that it obscures the content of the normative standards that logically precede it." Peter Westen, <u>The Meaning of Equality in Law, Science, Math, and Morals: A Reply</u>, 81 Mich. L. Rev. 604, 604 (1983).  Merely because one robbery is similar to another in that both are members of the legislatively-selected class of activities that constitute robbery does not mean that we should examine all robberies as a group for constitutional purposes.

Rather, at the least, individual acts cannot be aggregated if their effects on commerce are causally independent of one another.  That is, if the effect on interstate commerce directly attributable to one instance of an activity does not depend in substantial part on how many other instances of the activity occur,  there is an insufficient connection – in other words, an interactive effect – and the effect of different instances cannot be added.  If, on the other hand, the occurrence of one instance of the activity makes it substantially more or less likely that other instances will occur, then there is an interactive effect and the effects of different instances can be added.  It is this principle that we believe is meant when the Supreme Court speaks of a "class of activities." <u>E.g.</u>, <u>Perez v. United States</u>, 402 U.S. 146, 154 (1971) ("Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.") (internal quotation marks omitted).  As we will see, there are no such interactive effects for robbery.  When someone

8

steals $100, the effect attributable solely to that robbery on interstate commerce does not depend on how many other robberies occurred last year, nor will it determine or effect how many other robberies will occur.

Ordinarily, we would not say always, the interactive effects will be the supply-and-demand tugs of economic activity. Where Congress has sought to regulate – protect, enhance, or restrict – some particular market such as wheat, credit, minority travel, or abortion service, it has pointed the way to a rational aggregation test. It has identified those things that affect that market, things which if not all subject to the regulation would erode the effort. Intrastate production and sales can be aggregated, because the prices of goods and services are determined in interstate markets. If, for example, the federal government enacts a price control to ensure sufficient income for producers, it will be thwarted if consumers switch to buying goods in intrastate commerce or produce the goods themselves. Because the instances of economic activity are intimately connected and in the aggregate substantially affect commerce, Congress can regulate such activity.

We will focus on the distinction between economic and noneconomic activity. The distinction is not conjured to limit the commerce power arbitrarily. It is precisely to the contrary. It follows directly from the notion of causal interdependence –

ultimately from an insistence that aggregation rest on a rational principle.

A

Lopez is a useful starting point.  Its reasoning suggests a distinction between commercial and noncommercial activity.  The Lopez Court struck down the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V).  The Act made it a crime "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone."

In analyzing its prior approvals of congressional authority, the Lopez Court emphasized the economic nature of the activity in those cases.  The Court noted, for example, that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." Id. at 559 (emphasis added).  Wickard, for example, "involved economic activity in a way that the possession of a gun in a school zone does not." 514 U.S. at 560.

Finally, the Court explained, "The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567.  This statement is important because it characterizes the aggregation principle as applying to "economic activity." Cf. Gerald Gunther & Kathleen M. Sullivan,

10

<u>Constitutional Law</u> 191 (13th ed. 1997) (noting the possibility that the aggregation principle applies only to economic activity, without expressing a position on the issue). Though the Court did not explicitly state that only economic (or other interactive) activities can be aggregated, it is telling that the Court avoided characterizing possession as "an activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."[2]

Justice Breyer's dissenting statement of the aggregation principle differed critically from the majority's. "In determining whether a local activity will likely have a significant effect upon interstate commerce, a court must consider, not the effect of an individual act (a single instance of gun possession), but rather the cumulative effect of all similar instances," the dissent stated. <u>Id.</u> at 616 (Breyer, J., dissenting). From this statement, notably not restricted to a "local economic activity," the rest of the dissent's argument

---

[2]A concurring opinion also suggested a distinction between commercial and noncommercial activities, though it did not link this distinction to the aggregation principle. <u>See</u> <u>id.</u> at 577 (Kennedy, J., concurring, joined by O'Connor, J.) ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."); <u>id.</u> at 583 ("The statute now before us . . . regulat[es] an activity beyond the realm of commerce in the ordinary and usual sense of that term."). A second concurrence rejected the aggregation principle directly. <u>See</u> <u>id.</u> at 600 (Thomas, J., concurring). Justices Kennedy, O'Connor, and Thomas also joined the majority opinion.

followed.  Guns cause violence, violence hurts education, and ignorance hinders commerce.  See id. at 618-25.

The Lopez majority rejected this position by referring to the danger of sliding down the proverbial slippery slope: "[I]f we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." Id. at 564 (majority opinion).  In rejecting the dissent's mode of analysis, the Court did not announce a new analytic framework in an express test.  It made unmistakable, however, that the proper framework must distinguish economic from noneconomic activity.  The Court did so while offering the following concession: "Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty." Lopez, 514 U.S. at 566.

This does not mean that Congress cannot regulate noncommercial activity that by itself substantially affects commerce.  Rather, we conclude that the Court demands recognition of that distinction, or the more expansive one concerning interactive effects that it symbolizes, in the context of the aggregation principle itself.  The Court implied that besides gun possession in a school zone, school curriculum design and child rearing were areas beyond Congress's control.  See id. at 565-66.  As noneconomic activities, these cannot be aggregated, and individual instances of them can be reached only if they individually have a substantial effect on interstate commerce.

12

A rule that noneconomic activities cannot be aggregated, where there are no other relevant interactive effects among those activities, would be consistent with Supreme Court precedents besides Lopez.  The Lopez Court in particular explained how Wickard, "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," id. at 560, is properly seen as considering economic activity. "The Act was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices, which had previously obtained." Id.   Congress was attempting to regulate a market, and it was essential to reach the discrete components of the market.

The Wickard Court emphasized the farmer's role as a player in an economic system.  See id. ("'[I]f we assume that [wheat] is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market.'") (quoting Wickard, 317 U.S. at 128).  Wickard led many to suspect that the Court was prepared to uphold any congressional legislation whatsoever.  We think Wickard fits comfortably with our insistence upon interactive effects – indeed it is a compelling example.  At the least, there is sufficient ambiguity over whether the conduct was truly economic, that it offers

13

little or no support for a principle that allows noneconomic activity to be aggregated.

Other Supreme Court decisions allowing congressional authority are also consistent. The Lopez Court, indeed, listed several examples of cases that involve economic activity: Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264 (1981) (coal mining); Perez v. United States, 402 U.S. 146 (1971) (credit transactions); Katzenbach v. McClung, 379 U.S. 294 (1964) (restaurants); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964) (inns and hotels). See Lopez, 514 U.S. at 559-60.

We are told that our approach runs afoul of Russell v. United States, 471 U.S. 858 (1985), in which the Court upheld a federal conviction for conduct amounting to arson. That brief unanimous opinion of the Court, however, did not confront a constitutional challenge. Rather it was an effort at statutory construction. See Russell, 471 U.S. at 862 (alluding to the aggregation principle only in a paragraph beginning by examining the "terms [of] the statute"). See also United States v. Russell, 738 F.2d 825 (7th Cir. 1984), aff'd, 471 U.S. 862 (1985) (treating directly only the statutory issue). At best, the government can claim that the litigants assumed the interpretive issue was dispositive, and Justice Stevens's opinion for the Court did no more than settle disagreements among the lower

14

courts over the meaning of the statute.  He did not venture to explore the aggregation thicket.

Here, Congress has merely identified a class of objectionable conduct – robbery and extortion – and has sought to regulate such conduct as far as possible.  See 18 U.S.C. § 1951; Stirone v. United States, 361 U.S. 212, 215 (1960) (finding in the Hobbs Act "a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by . . . robbery").  Without identification of a market or specific property that Congress wishes to protect, it is difficult at best to assess whether Congress had a rational basis for reaching acts that are insubstantial when viewed alone.  The relevant constitutional inquiry turns on congressional purpose. See Hodel, 452 U.S. at 276 ("The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding.").

Significantly, we cannot invent rational bases that Congress might have identified.  Cf. United States v. Bass, 404 U.S. 336, 349 (1972) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.").  Hypothetical purposes supplied by counsel or the judiciary have no place in such a sensitive area of constitutional balance.

C

15

Though <u>Lopez</u> focuses on economic activity, there is a strong argument that some of the cases upholding congressional power may also be explained as resting upon aggregation of noneconomic activities interacting in other ways. The <u>Perez</u> Court, for example, emphasized the connections between loan sharking and organized crime. <u>See</u> 402 U.S. at 155-56. An individual offense committed by an organized crime group is not isolated from other offenses committed by that group, and indeed the commission of one offense promotes the others. Loan sharking was seen as an important part of the organized whole. For regulation to be effective, the government may need to be able to prosecute various intrastate offenses that individually do not have a substantial effect on interstate commerce.

The Supreme Court expressly noted, "In the setting of the present case there is a tie-in between local loan sharks and interstate crime." <u>Id.</u> at 155. Likewise, if an organized crime group committed various robberies that together substantially affected commerce, we would not doubt Congress's ability to prosecute a member of the group for one of them pursuant to an appropriate statute. Such prosecution would be an essential part of a larger regulatory scheme. For now, though, we need not venture beyond our principle of economic interdependence. Loan sharking was seen as the financial life blood of organized crime.

It is suggested that the civil rights cases turning on the Commerce Clause, <u>Heart of Atlanta</u> and <u>McClung</u>, can be understood

16

to have aggregated discrete acts of discrimination.  To be sure, the Court expressly applied the aggregation principle to the affected businesses' economic activity.  See, e.g., McClung, 379 U.S. at 300-01.  Justice Clark pointed to the testimony before Congress of the clog upon interstate travel worked by the virtual apartheid of racial discrimination.  See id. at 209-301.  The Court, however, also specifically noted that "while the focus of the legislation was on the individual restaurant's relation to interstate commerce, Congress appropriately considered the importance of that connection with the knowledge that the discrimination was but representative of many others throughout the country." Id. at 301 (internal quotation marks omitted).

That this economic regulation also had the goal – even a larger goal – of undermining a racist social norm does not defeat its constitutionality.  Cf. Lawrence Lessig, The Regulation of Social Meaning, 62 U. Chi. L. Rev. 943, 965-67 (1995) (explaining that the Civil Rights Act of 1964 served to change the social meaning ascribed to the serving by a white person of a black person).  Banning particular acts of discrimination may be ineffectual in changing attitudes and perceptions in the absence of a blanket ban.  Of course, we do not mean that Congress has the power to regulate an activity whenever it believes that it can change a social norm.  The simple fact is that in the context of discrimination a local restaurant resisting a norm of racism would lose to its competitors who did not change.  It is thus

once again economic regulation that finds its sustenance in the commerce power.  When Congress enacted the public accommodations provision it confronted acts of discrimination, each with cumulative economic effect.  Only because these acts were directly connected and interlaced could they form a wall of resistance, sometimes cemented by state laws that perpetuated such discrimination.

D

Catching the government's train of unyielding creative defenses of its power, one might argue that each incident of robbery hardens society and makes it more likely that other robberies will occur.  Accepting this argument would allow congressional regulation of any disfavored activity – quite close to the government's argument in this case.  Though an individual act of robbery may make us more resigned to the inevitability of crime, diverse robberies cannot rationally be said to be causally dependent on one another.  Thus, if various robberies are to be aggregated, they would need to constitute economic activity.  We would hold that they do not.

Perhaps the most plausible argument that robbery is economic activity is that it has an effect on prices of goods sold on interstate markets.  Because some robberies increase the cost of doing business, the argument goes, robbery causes all prices to rise and is thus economic.  This argument, however, is circular.  It seeks to aggregate robberies on the basis that if those

18

robberies were aggregated, a substantial effect on commerce can be discerned.  The question, under our approach, is whether robberies interact with one another in a way that makes it rational to sum their effects in Hobbs Act cases.  One might argue that each robbery causes victims to take additional security precautions, thus making other robberies harder to commit.  This type of effect, however, seems to "pile inference upon inference," Lopez, 514 U.S. at 567, and concluding that because one robbery deters another, Congress can aggregate them, seems downright bizarre.

One might argue that robbery is economic because it involves the transfer of money or property from the victim to the robber.  On this account, any such transfer interacts with all other activity in the economic system and is thus aggregable.  While to the eyes of the economist, the world, like the law, is a seamless web, we must separate activity that is properly considered economic from other activity that while having some connection to economic activity is not properly considered a part of the economic system itself.  We must thus look beyond our definition of interactivity to develop an account of what "economic activity" is, without embracing here the suggestions of Gary Becker and other economists that all activity is in one way or another "economic."  Economic theory informs and assists in the development of constitutional doctrine – but it is not and does not claim to be an organic limit of government.

The original understanding of "commerce" provides one source for such an account. As Justice Thomas persuasively argued, "[a]t the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." Lopez, 514 U.S. at 585 (Thomas, J., dissenting). Of course, the Supreme Court's understanding of "commerce" has grown to include production, entailing manufacture, agriculture, and services, all of which are unquestionably economic activities. While the original understanding must yield to the Supreme Court's jurisprudence, where they are aligned, we ought to be wary of choosing a different path.

There is no basis either in the original understanding or in the case law for including robbery in economic activity. Robbery is not selling, buying, or bartering, and it does not produce anything. It effects only the transfer of resources, and an involuntary transfer at that. It makes sense that the Framers wanted Congress to be able to strike against balkanization in regulating commerce, for in legislating, Congress sets the terms for economic interaction. Robbery does not implicate such terms, for robbery is everywhere the unlawful decision by a single party to deprive another involuntarily of his property. The essence of commerce is "commercial intercourse," Gibbons v. Ogden, 22 U.S. (9 Wheat.) 193 (1824), yet in robbery there is no exchange.

These are all strong reasons to conclude that robbery is not economic activity in the relevant sense, but we arguably do not need this analysis today. The Supreme Court in Lopez accepted, indeed took for granted, that education and family law were not within commerce. See 514 U.S. at 565-66. Along with regulation of crimes such as firearm possession, control over these areas traditionally falls under the police power of the states. The majority believed it necessary to distinguish "between what is truly national and what is truly local," id. at 567-68, and the police power provides a rough guide. Cf. Stone v. Mississippi, 101 U.S. 814, 818 (1879) (noting that it is conceptually far easier to determine whether an activity falls within the police power than it is to provide an accurate definition of the police power). We would hold that robbery is likewise in the realm of the police power.

The federalization of criminal law is a recent innovation. See, e.g., Task Force on the Federalization of Criminal Law, American Bar Ass'n, The Federalization of Criminal Law 7-9 (1998). The police power may include some regulation of criminal economic activity, and such activity could be aggregated. But where there is ambiguity as to whether certain activity is economic, whether that activity would be within the police power is an informing means of resolving the ambiguity. Because robbery's "economic" status is at best uncertain, that robbery is a traditional target of the police power buttresses our

21

conclusion that robbery is not economic and thus that robberies cannot be aggregated. This is a qualitative judgment, true enough. Yet the never-ending task of protecting our federalist government would be sorely weakened by a purchase only of a quantitative set.

## III

We pause to consider other possible interpretive approaches to the Commerce Clause and to explain our preference. Other circuits have held, even after Lopez, that a de minimis effect on commerce under the Hobbs Act is constitutionally sufficient. Some of their reasoning is conclusory. See, e.g., United States v. Stillo, 57 F.3d 553, 558 n.2 (7th Cir. 1995) (stating that the "Hobbs Act . . . is aimed at a type of economic activity, extortion," without explaining why extortion should count as "economic activity"); United States v. Farmer, 73 F.3d 836, 843 (8th Cir. 1996) ("We have no doubt of the power of Congress to protect from violence businesses that are part of an interstate chain."); cf. United States v. Atcheson, 94 F.3d 1237 (9th Cir. 1996) (assuming, without explanation, that "the Hobbs Act is directly aimed at economic activities").

Other cases simply assume that aggregation applies to all activities, without acknowledging that Lopez approvingly discussed the aggregation principle only in conjunction with economic activity. See, e.g., United States v. Bolton, 68 F.3d 396, 399 (10th Cir. 1995) ("if a statute regulates an activity

22

which, through repetition, in aggregate has a substantial affect [sic] on interstate commerce . . .") (emphasis added).  None answers the question of who decides what to count in the sums game.

A panel of this circuit, in United States v. Robinson, 119 F.3d 1205, 1210-15 (5th Cir. 1997), properly recognized that the ultimate test is whether there was a rational basis for congressional action.  See id. at 1210.  Though characterizing this standard as "deferential," the panel recognized that "'[d]eference is not acquiescence.'"  Id. (quoting United States v. Knutson, 113 F.3d 27, 29 (5th Cir. 1997) (per curiam)).  The panel, however, failed to recognize that when applied to the conceptual question of what effects may be summed, a rationality test can have bite.  In the instant case, the panel acknowledged that "local robberies are not the sort of economic activity that can legitimately be viewed in the aggregate for traditional economic impact analysis purposes," 151 F.3d at 456, but was bound by Robinson.

In any event, we will not fight straw men.  Rather, we will examine the five alternative interpretive approaches that we believe offer the most promise in upholding Hobbs Act convictions for local robberies.  Each of these approaches takes comfort in one or more of the cases, but we nonetheless find each wanting. We believe that our approach both fairly treats the cases and

offers a clearer basis for delineating the reach of Congress's power.

A

The most ambitious defense of Congress's power here denies that there must be connections among discrete activities for those activities to be aggregated. Lopez, on this view, announces a sort of proximate cause test, permitting regulation of activities that when aggregated have an effect on commerce that is perceptible without "pil[ing] inference upon inference." See, e.g., Deborah Jones Merritt, Commerce!, 94 Mich. L. Rev. 674, 679 (1995) (arguing that Lopez can be read as shifting Commerce Clause jurisprudence from a purely quantitative test to a more qualitative one). The connection between guns in schools and commerce can be perceived only through the series of inferences that Justice Breyer offered.

We do not claim that this is an unsupportable reading of Lopez. Certainly, the Court was concerned with connections between activities and commerce that seem too attenuated, and the Lopez Court, see 514 U.S. at 566, quoted its earlier remark in Jones & Laughlin Steel, 301 U.S. 1, 37 (1937), that congressional power under the Commerce Clause "is necessarily one of degree." We think the interpretation has trouble making sense of the Supreme Court's signal that courts will need to distinguish between commercial and noncommercial activity. In the end, though, we agree that when the Supreme Court has not explicitly

24

announced a test, finding majestic pronouncements in a sentence or two of its arguments has the earmark of a Rudyard Kipling "just so" story.

Our concern about this approach is that it is not a line or a test. At best it is descriptive of an outcome that lacks an identifying supporting principle. Any contrary suggestion is an illusion. A domestic homicide can be made a federal crime any time the victim is a wage earner. Battery within five hundred yards of a store doing business in interstate commerce also might be regulated. Perhaps even adultery in a hotel room rented in interstate commerce could be made a federal crime. A court might find that these go too far, the connection too attenuated. But we cannot be sure why beyond the conclusion that they "know it when they see it."

Indeed, the approach is so ill-defined that it is not even clear that it should allow prosecution of the robberies here. Such robberies have been prosecuted under the depletion-of-assets theory, the notion that robbery victims will have less money with which to make purchases in interstate commerce. This effect, while not absurd, is at best probabilistic, and victims without severe liquidity problems might well write off the loss and buy as before.

There is another problem. The proximate cause approach applies its limits after aggregation. This seems to imply that anything can be aggregated. Can all crimes of violence be

25

aggregated together? How about all crimes? It takes no leap, no inference upon inference, to conclude that crime as a whole has a substantial effect on commerce.  Surely such an approach does not give Congress the right to regulate all crime.  But what is magic about robberies that allows all of them to be lumped together, rather than grouped into subclasses depending on any of a number of variables? A proximate cause approach ultimately needs to be supplemented by some test limiting the scope of what can be aggregated.

Proximate cause is an appropriate creature for tort law. Because legislatures and judges cannot precisely define the contours of liability, we leave it to juries to supply common sense to vague legal standards, with occasional judicial intervention.  What works for torts does not necessarily work for constitutional law.  If we leave proximate cause determinations to Congress, then it will be able to find some justification for virtually any legislation.  And if we leave such determinations to courts, then we can give little advance guidance to Congress. With any rule, of course, some case-by-case interpretation is inevitable.  But some tests are clearer than others.

B

Another argument that would find federal prosecution of local robberies reachable under the Commerce Clause appears in United States v. Harrington, 108 F.3d 1460 (D.C. Cir. 1997), and again in United States v. Farrish, 122 F.3d 146 (2d Cir. 1997).

26

The argument avoids the puzzlement of aggregation, maintaining that because the Hobbs Act has a jurisdictional element, <u>any</u> concrete effect on interstate commerce is sufficient.

Where a statute has a jurisdictional element, this argument maintains, "each case stands alone on its evidence that a concrete and specific effect does exist, and we can find no controlling authority suggesting that courts must require that, as to each factual scenario, a 'substantial' rather than a 'concrete' effect on interstate commerce must be shown." <u>Harrington</u>, 108 F.3d at 1467. Indeed, the <u>Lopez</u> Court noted that the Gun-Free School Zones Act "has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that . . . have an explicit connection with or effect on interstate commerce," 514 U.S. at 561, omitting the requirement that the effect be "substantial."

As a preliminary matter, we do not think scaling back to an insubstantial but concrete effect could make a difference here. The jury was allowed to convict based on any indirect effect on commerce, and there was no evidence of any concrete effect. More significantly, the <u>Harrington</u> conclusion that only a concrete effect on commerce need be shown mistakes the Supreme Court's failure to mouth "substantial" repeatedly as a subtle limitation on the holding. The Court explicitly held that "the proper test requires an analysis of whether the regulated activity

27

'substantially affects' interstate commerce," <u>Lopez</u>, 514 U.S. at 559, without mentioning the aggregation principle.

Indeed, this approach threatens to reintroduce the discredited direct-indirect distinction into Commerce Clause jurisprudence, albeit in a new guise. It would allow direct effects that are not substantial, while requiring indirect effects to be substantial. A pickpocket who steals a subway token, causing his victim to walk home, could potentially be federally prosecuted, while someone who lifts $100 from an owner too rich to change his spending patterns as a result could not. There is no reason to think the Supreme Court intended anything of the kind.

A jurisdictional element by itself cannot save a statute that exceeds congressional authority. The jurisdictional element must in some way be meaningful, and the Supreme Court has specified a condition for meaningfulness in its substantial effects test. The Court noted that "§ 922(q) has no express jurisdictional element which <u>might</u> limit its reach," <u>id.</u> at 562 (emphasis added), but never stated that any jurisdictional element with the words "affecting commerce" <u>would succeed</u> in limiting its reach adequately.

C

We also reject the suggestion of the government that the convictions can be upheld based on the second of the three categories identified in <u>Lopez</u>, the power "to regulate and protect

28

the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at 558. The government's theory is that the victims were "in interstate commerce" because they purchased inventory and supplies from outside Texas. We view this category as encompassing only vehicles that move or could move in interstate commerce and people or goods traveling in commerce. See id. at 558 (citing Shreveport Rate Cases, 234 U.S. 342 (1914); Southern R. Co. v. United States, 222 U.S. 20 (1911)).

The United States maintains that United States v. Robertson, 514 U.S. 669 (1995) (per curiam), decided just days after Lopez, supports its analysis. Robertson involved the illegal investment of narcotics proceeds, and both investment and narcotics trafficking are undoubtedly economic. The Court held, however, that it did not need to consider the "affecting commerce" jurisprudence because the commercial activities Robertson was engaged in were themselves interstate activities. See id. at 671. Instead, the Court concluded that Robertson had "engaged in commerce" within the meaning of 18 U.S.C. § 1962(a). But this conclusion does not mean that Robertson is a category two case. Whether one is "engaged in commerce" under a statute is different from whether one is "in commerce" for constitutional purposes.

Even if the Court's references to its Commerce Clause jurisprudence mean that Robertson is to be seen as offering an implicit constitutional holding, this holding is better interpreted

29

as reaffirming the first category of Lopez, the power to "regulate the use of the channels of interstate commerce," 514 U.S. at 558, than as dramatically expanding the second.  The Court offered several examples of how Robertson conducted activities using the channels of interstate commerce.  For example, "[O]n more than one occasion, Robertson sought workers from out of state and brought them to Alaska to work in the mine." 514 U.S. at 671. Moreover, the activity that violated the statute was an investment of money in one state for equipment that was transported to another state.  See id. at 670.

D

Category one, which the government does not press, also does not apply in this case.  The strongest argument for application of this category is that the government may prosecute someone for "receiv[ing] . . . in commerce or affecting commerce" a firearm "if it demonstrates that the firearm received has previously traveled in interstate commerce." Bass, 404 U.S. at 350; United States v. Scarborough, 431 U.S. 563 (1977).  These cases, however, are also exercises in statutory, not constitutional, interpretation.

There is anyway a difference between banning possession of an item that has traveled in commerce and protecting a person or business that purchases items in interstate commerce.  While we need not here develop a test for category one, it suffices to note that if the latter nexus were enough, then Congress could regulate the activities, say, of people wearing clothes purchased in

30

interstate commerce.  Category one, as expressed in <u>Lopez</u>, notably does not entitle Congress to protect or otherwise regulate those who from time to time use the channels of commerce, and we see no reason to read it so broadly.

E

We also would reject a rule that would allow Congress to have its way, as long as it made sufficient legislative findings that certain conduct affected commerce.  The Supreme Court mentioned the absence of legislative findings in the Gun-Free School Zones Act.  <u>See</u> <u>Lopez</u>, 514 U.S. at 562-63.  But it did not promise that any such findings of "substantial effect" would immunize legislation from judicial scrutiny.  It merely indicated that findings might make a difference "<u>to the extent that [they] would enable us</u> to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." <u>Id.</u> at 563 (emphasis added).  <u>See also</u> <u>id.</u> at 612-13 (Souter, J., dissenting) ("The question for the courts, as all agree, is not whether as a predicate to legislation Congress in fact found that a particular activity substantially affects interstate commerce."). <u>Lopez</u> tell us that the Commerce Clause is not a political question wholly committed to congressional discretion and that although legislative findings are a useful prelude to a constitutional analysis, at some point constitutional doctrine must take over.

IV

The government parades horribles, listing statutes that it asserts would fall with our insistence upon rationality in aggregation, from the federal arson statute, 18 U.S.C. § 844(I), to the federal gambling statute, 18 U.S.C. § 1955; from the federal money laundering statute, 18 U.S.C. § 1956, to the federal carjacking statute, 18 U.S.C. § 2119; from the felon-in-possession statute, 18 U.S.C. § 922(g)(1), to the federal machine-gun statute, 18 U.S.C. § 922(o). We disagree. Typical prosecutions for these statutes are justifiable either under our test or under one of the other branches of the commerce power. But in the Hobbs Act, Congress has not identified, and probably cannot find, any rational basis for aggregation that would entitle the federal government to prosecute purely local robberies. In demanding that Congress accommodate the qualitative principle of our federalism that local crime be left to the states, we do no more today than insist that Congress identify a non-pretextual, rational basis for concluding that there are sufficient interactive effects among activities to allow them to be aggregated. Lopez says there is a line. Today we must draw that line.

Until recently, fifty years of judicial deference committed to the political branches the power to define the limits of their power under the Commerce Clause. To be sure, the judiciary has occasionally claimed a role, but its grasp on each occasion has slipped away. See, e.g., National League of Cities v. Usery, 426 U.S. 833 (1976), overruled by Garcia v. San Antonio Metro. Transit

32

<u>Auth.</u>, 469 U.S. 528 (1985). Even today, the government in effect says that the power of Congress is what Congress and the President say it is, subject only to the most vague and thin constraints.

This judicial repair to the sidelines has left Congress to police itself. With the increased federalization of traditional state crimes, the consequence of this acquiescence of the judiciary looms large. Not surprisingly, the increased overlapping of traditional state criminal statutes taxes the institution of Article III courts.

That the federal courts were created as courts of limited jurisdiction is no historical happenstance, some quirk of Article III without reflection elsewhere in the Constitution. Rather, their limited jurisdiction, set against the general jurisdiction of state courts, is integral to our federalism. It is in state courts that the overwhelming percentage of all litigation has always been conducted. Federal courts cannot play their vital historical role if they are to be cast as major criminal courts, trying the robberies, murders, assaults, and extortion historically the province of the states. And reading (or not reading) the Commerce Clause to support without locatable limits federal jurisdictional overlap of these traditional state crimes inevitably breeds federalization – checked only by the self-restraint of Congress, here conspicuously absent. That crime is a serious social concern does not mean that it is by that circumstance a federal matter.

Resisting this vertical movement from state to federal courts in no way steps upon the congressional role in defining the jurisdiction of federal courts, a role hammered from the Madisonian Compromise. By design, Congress may expand and contract diversity and federal question jurisdiction, and for the rawest of political reasons. The Founders concerned about the vitality of state courts could be confident in allowing Congress to define jurisdiction because they knew that the organic external constraints of Article I would cabin legislation and protect state courts. The problem has not proved to be with the power of Congress to define the grant to federal courts of federal question jurisdiction. Rather, it is the absence of judicially enforceable limits upon the power of Congress under the Commerce Clause to inject a federal question into traditional bodies of state criminal law.

The ad hoc and random use of the Hobbs Act to prosecute local robberies masks the dramatic reach of federal power required to sustain them. The full force of the government's assertion of authority, and the irrationality of the summing of effects undergirding it, is unmasked by the reality that if this application of the Act were sustained, Congress could also grant exclusive federal jurisdiction to all prosecution reachable by the Act – by adding a single line. And by the government's reasoning, that includes virtually all robberies. We need not judge the extent to which the commerce power remains yet a nigh political question to conclude that rationality remains a gate to the

34

exercise of congressional power even if its authority be limited by no more than its free political will.

We would reverse the Hobbs Act convictions.

DeMOSS, Circuit Judge, specially dissenting:

I join Judge Higginbotham's dissenting opinion.  He has heeded the mandate of the Supreme Court in *Lopez*, and has undertaken the arduous task of demarcating the "outer limits" of federal power, of distinguishing between "what is truly national and what is truly local."  *United States v. Lopez*, 514 U.S. 549, 566-68 (1995).  The interaction principle espoused in Judge Higginbotham's opinion is a much needed step toward injecting some measure of rationality into that process.

I write separately, however, because the present debate over the Hobbs Act extends well beyond the issue of whether the robberies in this case may, as a conceptual matter, be aggregated as a class.  Aggregation is an important aspect of this case, to be sure.  But the truly determinative question, one which I fear may be lost in the abstract debate over aggregation, interaction, causal interdependence, and the like, is whether the conduct in this case "substantially affects interstate commerce."  It is that standard, after all, which is our constitutional touchstone, and which should ultimately control the outcome of this case.  *Id.* at 560.

In the past several years I have written at length as to why local robberies of the present sort do not "substantially affect interstate commerce."  *United States v. Hebert*, 131 F.3d 514 (5th

Cir. 1997) (DeMoss, J., dissenting in part); *United States v. Miles*, 122 F.3d 235 (5th Cir. 1997) (DeMoss, J., specially concurring). And the reasons I have offered bear repeating.

In determining whether a class of activities substantially affects interstate commerce, we of course look to the legislative record for evidence of congressional findings of such an effect. Judge Higginbotham states in his dissent that Congress did not identify the market it wished to protect by passing the Hobbs Act. *United States v. Hickman*, ___ F.3d ___, ___ (5th Cir. 1999) (Higginbotham, J., dissenting). But I beg to differ. The legislative history of the Hobbs Act is replete with evidence that Congress passed the statute to combat highway robberies by labor union members which, at the rate of more than 1,000 per day, were having a considerable impact on interstate commerce. *Miles*, 122 F.3d at 244 (DeMoss, J. dissenting). However, nothing in the legislative history of the Hobbs Act indicates that Congress was concerned with local robberies of retail establishments. There is absolutely no legislative history suggesting that retail robberies were having a substantial effect on interstate commerce. Consequently, there is simply no rational basis for concluding that Congress found that local robberies of retail stores, whether aggregated or not, have a substantial affect on interstate commerce.

In the absence of legislative history supporting the extension of the Hobbs Act to local robberies, we are left with the plain language of the statute.  As I have explained in previous cases, it is clear from the wording of the statute that "commerce" refers to intercourse between the states.  *Hebert*, 131 F.3d at 528-239; *Miles*, 122 F.3d at 245.  Congress thus meant "commerce" in the ordinary sense, the flow of goods and people across state lines. It surely did not intend some metaphysical interpretation, where the taking of money from a cash register or attendant's purse becomes magically transformed into an economic event that bears on our national commerce.

Thus, while I join Judge Higginbotham's dissent, I reiterate my continuing belief that the applicability of the Hobbs Act should be determined with these more basic principles.